CITY OF DES MOINES, Appellant, v. DES MOINES WATER COMPANY, Appellee.

**HIGHWAYS:** Obstructions—Standpipes of Water Company—Negli-
1 gence. A standpipe, connected with a mechanism for controlling the supply of water, which is erected in a public street, with the consent of the city and the private water company, and at the expense of the benefited property owner, but which, after erection, is within the *arbitrary control* of the water company, becomes a part of the equipment of the water company, with consequent primary liability on its part to maintain the pipe in such manner that the public will not suffer injury therefrom.

**NEGLIGENCE:** Protruding Water Pipe in Sidewalk. The act of a
2 water company in allowing a water pipe, originally flush with the sidewalk, to remain for two years some 2 or 3 inches above the sidewalk, owing to the gradual sinking of the walk, presents a jury question on the issue of the company's negligence.

**MUNICIPAL CORPORATIONS:** Primary and Secondary Negligence
—Recovery. A city which has paid damages consequent on its neglect to compel a public utility licensee to perform its implied *primary* duty to maintain its street equipment in a safe condition, may recover over against such licensee. Such facts do not present a case of joint tort-feasors.

**MUNICIPAL CORPORATIONS:** Sunken Walk. Negligence is not established by a showing that a public walk was allowed, for several years, to remain in a slightly sunken condition, when it was not shown that such condition materially affected its solidity, safety, or usefulness.

*Appeal from Polk District Court.*—CHARLES A. DUDLEY, Judge.

JANUARY 20, 1920.

ACTION at law to recover from defendant the amount of a judgment recovered against the plaintiff city in favor of one Lulu M. Overstreet, administratrix, on account of personal injuries sustained by her intestate, Archie P. Overstreet, such injury having been caused by a defect in a public sidewalk. The city, having paid the judgment, demands reimbursement from the water company, on the theory that the defect in the walk was due to the neglect of the water company in the maintenance of a so-called "stop box" and pipe in such manner as to create an obstruction, over which Overstreet fell and was injured. There was a trial to a jury, and, at the close of all the testimony, the court sustained defendant's motion for a directed verdict in its favor. From this order and from the judgment rendered on the verdict, the city appeals.—*Reversed.*

*H. W. Byers, Reson S. Jones,* and *D. Cole McMartin,* for appellant.

*Parrish & Cohen,* for appellee.

WEAVER, C. J.—The grounds of the motion for a directed verdict were, in substance, as follows:

(1) That the evidence discloses no negligence of the water company, contributing in any degree to the injury or death of Overstreet, and does not show that the company was under any obligation to maintain the pipe or "stop box" over which Overstreet fell.

1. HIGHWAYS: obstructions: standpipes of water company: negligence.

(2) That the evidence shows conclusively that the condition of the walk referred to was due to the negligence of the city alone.

(3) That, if the company owed any duty with respect to the maintenance of the pipe or stop box, the city was also negligent, and the accident was occasioned by the joint tort of the city and the company, and neither can recover from the other.

The fact situation is the subject of but little dispute. The water furnished by the defendant company is distributed through a system of mains, laid along the course of the streets, and from the mains it is supplied to individual users, through branch or service pipes extending from the mains to the adjacent lots and buildings. The method of obtaining these connections for the use of adjacent property is about as follows: The property owner first makes written application to the company therefor, and is told to go to a licensed plumber, who obtains from the water company a permit to tap the main, and from the city a permit to open the street. The plumber then digs down to the main, at a point where the connection can be made, and opens a trench as far as may be necessary for laying the service pipe. In laying this pipe, when the plumber reaches a convenient point between the curbing and the lot line, he puts in a "stop box" and stopcock, by which the flow of water through the pipe is controlled. To provide means for operating this stopcock, a pipe extends therefrom to the surface above, and in the pipe is a rod, connecting with the stopcock. By this rod, with the aid of a

key, the cock is turned to admit or cut off the water. The property owners do not usually have these keys, and the water is ordinarily turned on and off by the company. From this stop box, the service pipe is extended into the building, ordinarily into the cellar, where it is connected with a meter, by which the supply is measured. There is also another stopcock at the meter. When the work is done, the plumber reports to the water company, and furnishes it with a plat showing the location of the stop box. The cost of the work we have described is paid by the property owner, but the meter is furnished and owned by the company. Concerning the practical use made of the facilities we have described, the principal managing officer of the defendant, after testifying to matters already mentioned, says, among other things, that, when a water user gives notice that he is about to move:

"We shut off the water,—turn it off at the stop box. One of our men takes a key for that particular box, if it requires a different key, and goes to the stop box and cuts off the water and leaves it locked. * * * The property owner has no authority whatever, either from the company or the city, to interfere with that water box at all, except to make proper use of it. If you had a house upon Fifth Street that was connected up with our plant, and you were not living there and were not paying for water, and you were not getting any water from us, you would not have any right to go and open that up. You would have to get authority from the company. * * * If a customer on our books does not pay his bill, or if we have a controversy with him about the water, we enforce our orders and demands by shutting off the water at the stop box we are talking about. * * * The water consumer has no right or authority to touch the stop box or to open it up again unless he gets authority from the company. That was the practice and the rule with respect to this house where the

accident occurred.  We have one invariable rule: that is, if the water is turned off for nonpayment of rent, the property owner must not turn it on again until he pays. * * * We have another fixed rule, and that is that we will not furnish water to anyone through a water service connection until the stop box attachment is made."

The evidence tends also to show that the pipe from the stop box to the surface was 1½ inches in diameter, and was covered by an iron cap, screwed to the top.  This cap, as we take it, stood substantially level with the sidewalk at the time the connection was completed; but, in the course of years, the walk had so settled as to make the top or cap protrude 2 or 3 inches above the surface.  It was over this obstruction that the deceased, Overstreet, is alleged to have fallen, and received fatal injuries.  After his death, action was brought against the city by the administratrix of his estate, charging the city with negligence in permitting said pipe to thus obstruct the street and render the use of the street dangerous for pedestrians.  To said suit the water company was also made a defendant; but, before any action had been taken therein, the administratrix dismissed her suit as to said company.  Thereafter, the city entered into a settlement, and compromised with the administratrix concerning her claim for the agreed sum of $2,500 damages and $24.05 costs, which was then and there paid her for the benefit of the estate of the deceased.  This settlement, the appellee herein concedes, was reasonable and fair, and made in good faith.

The foregoing statement is sufficient to present the real nature of the claim and defense.  Assuming its truth, would the jury have been justified therefrom in finding the defendant company chargeable with negligence on account of the condition of the sidewalk, as affected by the water pipe's protruding from its surface?

I.   In approaching and considering the issues in this

case it is important to keep in mind the fact that this controversy is not one between the water company and the owner of the property for the use of which the service pipe and connection were constructed. Were the water company and property owner here disputing as to which, if either, is primarily bound to maintain and care for the stop box and pipe constructed in or under the sidewalk, the inquiry as to who, in fact, asked for it or ordered it or constructed it or paid for it, would be quite material and perhaps decisive; but, for reasons which will be apparent as we proceed, those matters are far from conclusive in this action. The inquiry here is not at all what duty the water company owed or owes to the property owner with whose lot or building the water connection is made, but what duty, if any, the company owed, or owes to the city and public whose streets it uses for its own profit in serving the property owner.

For this reason, we are unable to agree with appellee that the fact, appearing in the record, that, by city ordinance, no one was authorized to make any excavation in the streets without application to or permit by the city or its board of public works, and that the application in this instance was made by, and the permit issued to, the property owner, or that he was himself a licensed plumber, and himself performed the work, is, of itself, controlling of the case before us. Nor do we think it quite a correct statement of the case, as developed by the testimony, that the only interest defendant had in the stop box and its attachments was "simply the right to use it in common with any plumber or other person who had occasion to shut off the water." The clear effect of the defendant's own testimony and the explanation which seems to have been given very frankly by its superintendent on the witness stand, to say nothing of common knowledge and common observation of the methods everywhere in use by public service water com-

panies, is that the entire aggregation of its correlated parts, extending from the source of its supply through its network of mains, conduits, and service pipes to the meters through which the water is finally measured and delivered to the consumer, is but a single system, over which the company exercises (and, for present purposes, we may say it necessarily exercises) a control which is little less than autocratic. Although the property owner is required to be at the expense of making the connection between the company's main and the company's meter, yet, when made, and thus incorporated into the system of water distribution, it passes, to all practical intents and purposes, into the paramount control of the company.

The stop box and stopcock are, in effect, the lock or gate by which the company controls the water supply to the property owner. The company opens it only when its rules are complied with; and, when dispute or disagreement arises between it and the lot owner, it locks the gate and cuts off the supply. The control of the stop box and cock is thus made an efficient means of discipline in enforcing the company's rules and demands. In the language of the superintendent:

"If a customer on our books does not pay his bill, or if we have a controversy with him about the water, we enforce our demands by shutting off the water at the stop box. * * * The consumer has no right or authority to touch the stop box or open it up again unless he pays his bill and gets authority from the company to open it up again."

The suggestion of counsel that the stop box and its attachments are simply a convenience furnished by the lot owner, and only used by the company in common with the plumbers and others, is not borne out by the record.

There is nothing in the evidence tending to show that, during the 24 years and more which have elapsed since this stop box was put in, the lot owner has ever assumed its use

or control in any form or to any extent. But, were it other-wise, and were it to be conceded that the stop box and the pipe extending therefrom to the surface of the sidewalk were kept and maintained for the common use and con-venience of the company and the lot owner, it would clear-ly still be the duty of the company, as well as of the lot owner, to use reasonable care to see that such apparatus, planted in the public walk for its use (whether exclusive or in common), is. so constructed and maintained as not to create a nuisance or source of peril to persons lawfully us-ing the public way.

It is unnecessary, therefore, to attempt any very ex-act definition of the mutual rights and obligations of the company and the customer or property owner whom it serves. The company, by its franchise or its contract with the city, is granted a license to use the streets for the con-struction of its system. Of necessity, this implies the right, under proper regulation, to lay its mains and pipes be-neath the surface, and at many points to extend them under and across the course of public travel; and, as a matter of law, it must be held to be an implied condition of such license that these instrumentalities by which it distributes its water supply to its patrons shall be con-structed and maintained with reasonable care for the safe-ty of those who are lawfully exercising the primary right of the public to use the streets for the purposes of travel. These propositions appear to us to be quite elementary, and to call for no extended inquiry into the precedents afford-ed by the decided cases. But, as bearing upon the prin-ciple involved, see *Gas L. & C. Co. v. Columbus*, 50 Ohio St. 65 (19 L. R. A. 510).

Our attention is called, however, to a decision of the Supreme Court of the United States which is much like the case before us both in fact and in the principles ap-plied. See *Washington Gaslight Co. v. District of Colum-*

*bia,* 161 U. S. 316 (40 L. Ed. 712). In that case, the gas company placed its stop box in the street, to control the flow of gas through a service pipe to the house of an adjacent owner. It was put in by the company at the request of property owners, by whom the cost or expense of the installment of the connection so made was paid. The work, as constructed, was skillfully done and reasonably safe. In the matter of the use and control of the stop box, the evidence was not materially unlike that which appears in the instant case. After the stop box was put in, the street was widened, and, by reason of this change, the box came to be about in the middle of the sidewalk. The cover, which was about level with the surface of the walk, was broken, or had been removed; and the plaintiff, in using the walk, stepped into the opening thus made, and was injured. There, as in this case, the company defended on the ground that there was no duty resting upon it to maintain or repair the stop box; that it was placed in the street at the request of the property owner, and paid for by him; and that the company did not assume, nor was it charged with, any duty for its proper maintenance. Plaintiff sued the city on account of the injury so sustained by her, and recovered a judgment for damages; and the city, having paid the judgment, sued the gas company for reimbursement. On the trial of the latter case, the court instructed the jury, as a matter of law, that the stop box "was a part of the apparatus of the company, and hence it was its duty to exercise proper care over it, and thus to prevent injury to persons using the sidewalk." On appeal by the gas company from a judgment in the city's favor, the court, speaking by Chief Justice White, affirmed the recovery, and said:

"The plain object contemplated by the formation of the gas company was the supplying of the gas, to be by it manufactured, to consumers; and it is obvious that this

could not be done without making a connection between the street mains and the abutting dwellings. When such connections are made with the mains, they receive from them and convey into dwellings highly inflammable material, which flows by an uninterrupted channel from the mains themselves into such dwellings. It must, therefore, have necessarily been contemplated that such connections with the mains as were, from their very nature, incidental to and inseparably connected with the consumption of gas should be a part of the apparatus of the gas company, and be under its control, rather than under that of the city or the property owner."

Further discussing the case, the court says:

"It would be unreasonable to infer that Congress, when it authorized the use of the streets or sidewalks for the purposes of the gas company's business, contemplated that the city of Washington * * * should keep in repair such apparatus, the continued location of which in the sidewalks of the city was permitted, not only as an incident to the right to make and sell gas, but also for the pecuniary benefit of the gas company. We conclude, therefore, that the duty was imposed upon the gas company to supervise and keep the gas box in repair. * * * Nor do we think that this duty was affected by the circumstance that the cost of the labor and materials used in the construction of the connection and gas box was paid by an occupant or owner of property, who desired to be furnished with gas. As the service pipe and stopcock was a part of the apparatus of the company, and was used for the purpose of its business, it is entirely immaterial who paid the cost, or might in law, on the cessation of the use of the service pipe and gas box by the company, be regarded as the owner of the mere materials."

So reasonable and just seems to be the rule applied in the cited case, and so fundamental is the principle that

a party who is licensed to use the street for the purposes of private profit, even though the use be one of public utility, is charged with the duty to exercise all reasonable care that the instrumentalities of such use are not permitted to become nuisances, that argument in their support can hardly be necessary.

In so far, therefore, as the judgment entered by the trial court exempts the defendant from the duty or obligation to so keep and maintain the stop box and pipe in question that they do not constitute a source of danger to persons lawfully using the sidewalk, it cannot be sustained.

II.   Assuming the existence of such duty, does the evidence make a case for the jury upon the question of defendant's negligence? On this point there is little room for controversy. It is probable that, as originally constructed, 24 years before the accident to Overstreet, the upper end and cap of the stop box pipe were substantially level with the surface of the sidewalk, and did not then constitute any obstruction to the safe use of the walk by pedestrians. Later, as we have before said, the walk had settled, leaving the pipe and cap protruding above the surface in such manner that a traveler, exercising ordinary care, might readily trip, and receive a violent fall. Just how long this condition had existed at the time of the accident is not definitely shown, but there is testimony from which it could be found that the defect had been noticeable for two years; and the court cannot say, as a matter of law, that this was not a sufficient period for the appellant, in the exercise of reasonable supervision over its apparatus in the public street, to have discovered it, and to have removed the danger thereby created.

2. NEGLIGENCE: protruding water pipe in sidewalk.

The question of negligence and notice, as well as of proximate cause, was also for the jury.

III.   Appellee also relies upon the proposition that,

even if it be chargeable with negligence, the city was also negligent, and contends that, under the familiar rule that one joint tort-feasor cannot maintain an action to enforce contribution from another, the trial court rightfully dismissed the plaintiff's action.

3. MUNICIPAL CORPORATIONS: primary and secondary negligence: recovery.

The soundness of the rule is to be admitted, but it does not avail the defendant in this case. In the first place, as between the company and the city, the primary duty to so maintain the pipe as to avoid endangering the walk for public use, was upon the former; and, as between the public and the city, the latter became chargeable with negligence only when it failed to exercise care in requiring the company to remedy or remove the defect. Being so negligent, and an injury having so resulted to Overstreet, the city could not avoid liability to the injured man by shifting responsibility for the fault to the shoulders of the water company; but, having paid the damages for the injury so inflicted, it could rightfully demand of the water company satisfaction for the amount it had thus been compelled to pay. See the case above cited, *Washington Gaslight Co. v. District of Columbia*, 161 U. S. 316 (40 L. Ed. 712); *City of Sioux City v. Weare*, 59 Iowa 95; *City of Ottumwa v. Parks*, 43 Iowa 119; *Inhabitants of Milford v. Holbrook*, 91 Mass. 17.

Whatever doubt there may be, under the somewhat conflicting precedents, as to the extent of the liability of an abutting owner to the city for damages paid by the city on account of his mere omission to perform some duty imposed upon him by law or ordinance, there can be none where the negligence is that of one occupying the street or walk as a mere licensee, under an express or necessarily implied obligation to avoid the creation of a nuisance therein. It has been well said by the New York court that,

upon receiving license to occupy a public street for a private purpose, "the licensee impliedly agrees to perform the act in such a manner as to save the public from danger and the municipality from liability." *Village of Port Jervis v. First Nat. Bank,* 96 N. Y. 550, 557. And when the municipality, having paid damages because of the licensee's negligence, sues the latter for reimbursement, it is not a claim by one joint tort-feasor against another, but is rather a claim for failure of the licensee to perform its undertaking to save the licensor from liability on account of the former's negligence. Or, to quote again from the Massachusetts court:

"The plaintiffs were not *in pari delicto* with the defendant, and therefore the principle that one joint wrongdoer cannot have contribution against another has no pertinency. The only fault or negligence which could be imputed to the town, on the facts shown, was a failure to remedy the nuisance which the defendant had caused. This is no bar to their claim for indemnity." *Inhabitants of Milford v. Holbrook,* supra.

It is further objected, if we understand counsel, that the city was negligent in that the projection of the pipe above the walk was not caused by any act of the defendant, but by the settling of the walk, a condition which the city had not attempted to remedy by lifting or building the walk up to its original level. In our opinion, there is nothing in the testimony from which the jury could find the city negligent in this respect. Few, if any, sidewalks, especially if constructed of brick, stone, or cement, and laid upon the earth, will not settle to some degree, in the course of years; and, if such settling be not so great or so irregular or uneven as to materially affect its solidity, safety, or usefulness, it cannot be said to show any breach of duty on part of the city. It may also properly be said

4. MUNICIPAL CORPORATIONS: sunken walk.

that the defendant, being charged with the duty to properly maintain the stop box, may be presumed to have understood the natural tendency of the walk to settle, and the consequent elevation of the upper end of the standing pipe above the surface. The duty to care for these instrumentalities implies, as well, the duty of inspection at reasonable intervals; and, if this had been done at any time during the two years before Overstreet received his injuries, the need of the repair would have been apparent.

It follows from what we have said that the trial court erred in directing a verdict for the defendant, and a new trial must be ordered.

The judgment of the district court is, therefore,—*Reversed.*

LADD, GAYNOR, and STEVENS, JJ., concur.