# MUTUAL BENEFIT HEALTH & ACCIDENT ASS'N v. DEN-TON.—124 S. W. (2d) 278.

Middle Section.   November 19, 1938.

Petition for Certiorari Denied by Supreme Court, February 4, 1939.

D. L. Lansden and McConnico, Hatcher & Waller, all of Nashville, for plaintiff in error.

Jackson & Buckner, of Murfreesboro, for defendant in error.

FAW, P. J. This is an appeal in error by Mutual Benefit Health & Accident Association, a non-resident corporation domesticated in Tennessee, the defendant below (and hereinafter designated as defendant), from a judgment for $2,999.99 and costs in favor of Mrs. Frances Denton, the plaintiff below (and hereinafter designated as plaintiff).

John W. Denton died on February 17, 1937, and plaintiff is his widow, and was named as the beneficiary in an accident policy issued by defendant on December 3, 1936, by which policy defendant contracted to pay $5,000 on proof of the death of said John W. Denton, the insured, resulting, directly and independently of all other causes, from bodily injuries sustained through purely accidental means, and providing that "suicide, sane or insane, is not covered."

Defendant declined to pay the sum stipulated in the policy, or any part thereof, and plaintiff brought her action in the Circuit Court of Rutherford County on May 25, 1937, for $7,500, and filed her declaration containing appropriate averments with respect to the policy contract, proofs of loss, defendant's refusal to pay, etc., and averring that "on February 17, 1937, the said John W. Denton suffered an accidental injury, causing his death on said day; he being accidentally shot through the head, resulting in his death."

On June 21, 1937, the summons and declaration were (by leave of the Court granted on plaintiff's application) amended so as to reduce the amount of plaintiff's demand to $2,999.99.

On June 23, 1937, the defendant filed two pleas—nil debet and non assumpsit. These pleas admitted every defense material in this case, whether by way of denial or avoidance (Provident Life & Accident Insurance Co. v. Prieto, 169 Tenn., 124, 159, 83 S. W. (2d), 251), and, upon the issues thus made, the case was tried to a jury, who found the issues in favor of the plaintiff and fixed the amount of her recovery at $2,999.99, and the Court rendered judgment accordingly against the defendant for $2,999.99 and all the costs of the cause.

Defendant's motion for a new trial was overruled, and defendant thereupon appealed in error to this Court, and is here insisting, through assignments of. error, that there was no evidence upon which the jury might properly base a judgment for the plaintiff, and that the trial court erred in overruling defendant's motion (which was made at the close of all the evidence) to direct the jury to return a verdict in favor of the defendant.

The insured, John W. Denton (to whom we will, for brevity, refer either as Denton or as the insured), was, for eight years before and until his death, a resident citizen of the town of Murfreesboro, where he operated a business as a coal dealer and maintained an office at his "coalyard."

About nine o'clock in the morning of February 17, 1937, Denton was found dead in his office. He was seated in an armchair, with a revolver (sometimes referred to in the record as a pistol and sometimes as a gun) gripped in his hand, and a bullet wound through his head. It was stipulated of record at the trial below "that Mr. Denton died from the bullet wound in the head."

The evidence had no tendency to prove, and it is not claimed, that any one other than the insured was responsible for his death; hence the sole controversy in the trial court was, whether the pistol shot that killed Denton was fired by him accidentally, or with the intent to destroy his own life.

The verdict implies that the jury found that the shot which caused Denton's death was fired accidentally and not intentionally. The inquiry in this Court is, whether there was any evidence upon which the jury could base such finding, that is, "some evidence of a material or substantial nature." The "scintilla rule" does not obtain in this State. Brenizer v. Railway, 156 Tenn., 479, 484, 3 S. W. (2d), 1053, 8 S. W. (2d), 1099.

Shortly before nine o'clock A. M. on the day of his death, Denton sent George Binford, a negro porter in his employ, to the post office for his mail, and when Binford returned he found Denton in his office dead. Binford called Mrs. Denton on the telephone, and then went out on the street to "get somebody." In a few minutes, the witnesses Travis, Woodfin, Powers, Cannon and Vaughn had assem-

bled at Denton's office, and, in their testimony, they describe the situation and condition of the body of Denton, and the surrounding appearances in the office. Woodfin was the coroner of Rutherford County and also the undertaker, who later prepared Denton's body for burial. Powers was Chief of Police of the town of Murfreesboro. Vaughn was a Justice of the Peace at Murfreesboro. Travis and Cannon were business men, whose places of business were near that of Denton.

The witnesses do not disagree in their testimony about any material matters; hence there were no conflicts of testimony or questions of the comparative credibility of witnesses to be determined by the jury; so that, another way of stating the question for decision by this Court is, whether the jury could reasonably infer from the undisputed facts in evidence that Denton shot himself accidentally?

The witnesses found the dead body of Denton in an armchair, and in such a position as that, if referring to a living person, it might be said that he was seated in a natural position. His head was inclined toward his right shoulder and was resting against the back of the chair at its right corner. His legs were crossed (with the left leg over the right leg) and his left hand was lying upon and across his left leg and "gripping" the handle (or butt) of a revolver. His right arm was "swinging down" across the right arm of the chair. There was a bullet wound through his head. The bullet had entered about one inch to the rear and slightly higher than his left ear, and had made its exit above the right ear and a little higher than the point of entrance. Denton's hat and eye glasses were on the floor at the right of the chair in which he was sitting, and there was a powder-burn on the left side of the hat "about the size of a dollar."

The chair in which Denton's body was found was sitting near a desk which the witnesses describe as a "standing desk," meaning, as they explain, that, because of its height, it was designed for use by a person standing beside it, and could not be used by one seated in a chair. When his body was found in the chair, Denton's keys, knife and pipe, and a wire and cloth suitable for cleaning a pistol, were found on the desk above mentioned.

The record contains two photographs which are a material aid in visualizing the position of Denton's body in the chair when found by the witnesses. The witness Travis posed for these photographs by seating himself in the same chair and in the same posture as he found Denton a few minutes after the fatal shot was fired. All of the witnesses who saw Denton in the chair agreed that the photographs accurately reproduce the position and situation of Denton's body and its surroundings, with the single exception that the witness Powers thought the legs were "more straightened out" and were "crossed over" somewhat differently; but otherwise he thought the picture

showed "the accurate position" of Denton's body in the chair. This slight difference as to the position of Denton's legs was wholly immaterial.

Denton was left-handed, according to the testimony of his porter, George Binford, and he was ambidextrous according to the testimony of his son-in-law, John Jolley.

The pistol in Denton's hand, when he was found dead as aforesaid, was a "Hopkins & Allen" revolver, with five chambers for cartridges in the cylinder. There was one empty shell, which was under the hammer, and there were three cartridges in the cylinder that had not been fired. The empty shell showed that it had been "snapped on" twice and two of the cartridges that had not been fired had been "snapped on." The revolver was designed for center-fire cartridges, and one of the unfired cartridges that had been "snapped on" was a rim-fire cartridge that could not be fired by this gun. The cylinder revolves to the right, and there is evidence that the cartridge that had not been "snapped on" was in the next chamber to the right of the empty shell.

The pistol by which, it is conceded, the shot was fired that killed Denton was, according to the undisputed testimony of plaintiff's witness Vaughn, "just an old dirty gun," and in "very bad condition." Vaughn stated that he did not notice whether it had just been cleaned or not, but Powers stated that, "this gun showed all evidences of having been cleaned and oiled." However, no witness testified that there was an oil can or any oil in Denton's office at the time in question. The witness Travis enumerated the several articles on Denton's desk as before mentioned, and he was later asked if he noticed any gun cleaning oil on the desk, and he replied: "I don't remember about the oil, but there was a wire with some wrapping on it and some rags—looked like they had cleaned a gun."

George Binford, colored, was employed by Denton at his coal-yard for four or five years before and until Denton's death. Binford testified that he and Mr. Denton were at the coal-yard early on the morning of February 17, 1937; that Mr. Denton had "gotten out of coal the evening before;" that Denton told him "he was expecting a car in from some company in East Tennessee, but it had been delayed and hadn't got there;" that Denton bought some coal from trucks and sometimes bought it from the car; that on that morning "Mr. Lester" came by with his truck and promised to bring back two tons; that Lester didn't unload any coal but said: "I have got two tons to put off at Mr. Cantrell's and I will bring you back the other two;" that Mr. Denton then went off and stayed a while and got a hair cut and came back and asked him (Binford) if Mr. Lester had come back yet, and witness replied that he had not.

Binford then testified further as follows:

500

A. "And I said, 'He told me he thought he had it all sold' and Mr. Denton said 'He promised me he would bring me back two tons and I wish he would come on, I need it to fill a few little orders.' Then a little later I got up and walked out, outside the door, and looked up the street and went on uptown and I saw Mr. Lester's truck parked right in front of the Courthouse, just sitting there with the coal in it. He hadn't unloaded any of it. And when I came back I said 'Mr. Denton, Mr. Lester is parked uptown' facing the courthouse door' and he said, 'I declare, if I had known you were going uptown I would have sent by you to get the mail.' He said, 'Here take my keys and get the mail for me.' He said, 'Get in the truck.' I got in the truck and went to the post office and got the mail and coming' back I stopped and talked to a boy a little while and then come on back. When I got back to the yard I didn't see Mr. Denton nowhere and I thought he must be inside somewhere, so I drove the truck up under the shed and got out and went in and didn't see him no place and I said to myself 'Reckon where Mr. Denton is' and I walked by the desk—come in this way—(indicating) and I looked over there and he was sitting there at his desk with his right hand dropped down like that and his left hand dropped over there. I didn't see what he had in his hand. . . .

"Mr. Waller: Tell just how Mr. Denton was sitting and what you saw.

"A. He was sitting with his arm dropped to his side and his head laying over that way.

"Q. Is that a high desk? A. Yes, sir.

"Q. That you sit up to with a stool? A. Yes, sir, and his knife was on it and his handkerchief and some other things laying there. I went out to call somebody and met Mr. Lester down on the corner and hollered at him and got in the car with him and come on back and I said 'Mr. Denton is dead' and he was scared to go in and about that time Mr. Travis and another man come up.

"The Court: Who was it you went after? A. I met Mr. Lester. I went out to get somebody.

"Q. When you got back with Mr. Lester, who else came up? A. Mr. Travis and somebody else, I don't remember who it was now.

"Q. Did they go in? A. I went in first, then Mr. Lester come in behind me, then Mr. Travis and them come in.

"Q. Was Mr. Denton sitting just like you left him? A. Yes, sir."

The insured, John W. Denton, was about fifty-five years of age at the time of his death. He had been married to the plaintiff for about thirty years. They lived in Murfreesboro, and their daughter, Mrs. Jolley, with her husband and little son, seven years of age, lived with them.

On August 21, 1936, Denton filed a voluntary petition in bank-

ruptcy and scheduled unsecured debts of $1,913.07 and no assets. Apparently he concealed from his wife the fact of his petition in bankruptcy, for she testified at the trial that she knew nothing of it. The furniture in his home was mortgaged at the time of his death, and his widow discharged the encumbrance on the furniture with funds received from his life insurance. He had maintained a deposit and checking account with the Murfreesboro Bank & Trust Company, but from and after September 12, 1936, he had a balance of twelve cents, and no more, to his credit. There is no evidence that he had an account with any other bank. In December, 1936, Denton owed the witness Joss, an automobile mechanic, one hundred and twenty dollars for repairing a wrecked automobile, and gave Joss a check drawn on the Murfreesboro Bank & Trust Company for a balance of one hundred dollars on the account. The Bank declined payment of the check because of "insufficient funds" to the credit of Denton, and Joss procured a warrant for the arrest of Denton. Upon the assurance of Denton's attorney that the check would be paid if Joss would wait a little while, the criminal case was continued indefinitely, and that was its status at the time of Denton's death. Two days before his death, Denton talked with his son-in-law, Mr. Jolley, about the Joss check, and Jolley agreed to let Denton have the money to pay the check out of his (Jolley's) salary when received. Jolley was employed by the Sewanee Iron & Fuel Company at a salary of one hundred and fifty dollars a month, and, commission on a certain amount of tonnage, and he was customarily paid on the 1st and 15th of each month, salary and traveling expenses. His check was received on February 17th, (the day Denton died). No part of the Joss check had been paid at the time of the trial below.

So far as the record shows, the insured was in good health at the time of his death. There is no direct evidence relating to the state of his health. There is evidence that Denton was "a jolly, jovial, good sort of fellow."

The plaintiff, Mrs. Denton, and her daughter, Mrs. Jolley, testified that Mr. Denton went about his usual duties around the house in his customary manner before leaving home on the morning of his death; that according to his custom, he placed a nickel on the mantel for his little grandson's lunch that day, and that they saw nothing out of the ordinary in his manner and demeanor.

Mrs. Denton stated that on the night before he talked to her "like he always did"—"talked and planned different things he was going to do;" that he got up that morning and kissed her goodbye like he always did, and that she had never received any note from him after his death.

Mrs. Jolley stated that, before he left home on the morning of his death, Mr. Denton "was very jovial and happy like he always was

every other morning,'' and that he talked to the family and discussed matters the same as he usually did.

G. Marable, a barber who worked in a shop patronized by Denton, cut his (Denton's) hair about an hour and a half before his death. Marable testified that ''there wasn't much said either way that morning,'' but that he saw ''nothing the matter with him out of the ordinary.''

We have, we think, stated, in substance, all of the material evidence in the record, and, viewing the evidence in that aspect most favorable to the plaintiff of which it is reasonably susceptible, it is our duty to determine whether an inference supporting plaintiff's contention that the death of the insured was accidental can reasonably be drawn from the evidence?

Counsel disagree somewhat with respect to the weight that should be given to the ''presumption against suicide.'' This has been the subject of a line of reported opinions in this State, beginning with Insurance Company v. Bennett, 90 Tenn., 256, 16 S. W., 723, 25 Am. St. Rep., 685, and culminating in an elaborate and able opinion in the case of Provident Life & Accident Insurance Company v. Prieto, prepared by Mr. Special Justice Edward J. Smith, and published in 169 Tenn., 124, 83 S. W. (2d), 251, 267.

In the Prieto Case, supra, after a review of a multitude of authorities, the Court said:

''From a consideration of the cases cited in the briefs of counsel, as well as of many others found by the Court's independent investigation, it is believed, with reasonable confidence, that the decided weight of authority, federal and state, supports the following propositions:

''(1) In a suit on an accident policy where the plaintiff can recover only for an accidental death, the affirmative of the issue is on the plaintiff from the beginning to the end of the trial, and the burden of proof in its general sense is on the plaintiff to show an accidental death.

''(2) This burden is met, and a prima facie case made out, when the plaintiff has shown a death by external and violent means under circumstances not inconsistent with accident.

''(3) Where a death by external and violent means is shown, and there is no proof as to how it was caused, or the attendant circumstances leave the question doubtful, or the proof concerning them is conflicting or not inconsistent with accident, the law presumes an accidental death, and the burden of proof, in its secondary sense, is cast on the defendant, and requires it to prove by a fair preponderance of the evidence that death was caused by suicide.

''(4) This presumption is not displaced by proof of circumstances which merely tend in a greater or less degree to show suicide, but in

such case it is a question for the jury whether they overturn the presumption.

"(5) Where there is no proof indicating either accident or suicide in case of a death by external violence, or where the proof is equally balanced, or is conflicting, this presumption comes to the aid of the plaintiff, in making out his or her case.

"(6) Where death by external violence is shown by facts or circumstances, inconsistent with accident, the presumption against suicide is displaced, and no longer continues to operate in favor of the plaintiff."

As pointed out in the Prieto case (page 146, 83 S. W. (2d), page 260) the Tennessee cases have followed the case of Travellers' Insurance Company v. McConkey, 127 U. S., 661, 8 S. Ct., 1360, 32 L. Ed., 308, as "the leading authority in cases of this character;" and so it was until the opinion of the same Court in the case of New York Life Insurance Company v. Gamer, 303 U. S., 161, 58 S. Ct., 500, 503, 82 L. Ed., 726, 114 A. L. R., 1218, reexamined the question, and, although not in terms overruling the McConkey case, announced certain rules contrary to the interpretation of the McConkey case by many courts, including the courts of Tennessee. In the opinion in the Gamer case, it is said: "The presumption [against suicide] is not evidence and ceases upon the introduction of substantial proof to the contrary. . . . "The evidence being sufficient to sustain a finding that the death was not due to accident, there was no foundation of fact for the application of the presumption; and the case stood for decision by the jury upon the evidence unaffected by the rule that from the fact of violent death, there being nothing to show the contrary, accidental death will be presumed. The presumption is not evidence and may not be given weight as evidence."

The principles stated in the above quotations from the opinion in the Gamer case appear to be inconsistent with some features of the fourth and fifth "propositions" hereinbefore quoted from the Prieto case, but it is not for us to express our opinion as to the relative merits of these conflicting rules, for we understand that the question involved is one of domestic law, which the courts of each state may decide for their own jurisdiction, and not one necessarily controlled by the decisions of the Federal courts; hence it is our duty to follow the rulings of the court of last resort in this State, which we think are clearly stated in our quotation from the Prieto case, supra.

But in this jurisdiction the presumption against suicide does not necessarily require the submission to the jury of all cases involving the issue of death by accident or suicide. This would seem to be a logical sequence from the sixth "proposition" before quoted from the Prieto case, viz: "Where death by external violence is shown by facts or circumstances, inconsistent with accident, the pre-

sumption against suicide is displaced, and no longer continues to operate in favor of the plaintiff."

Moreover, in the Prieto case, the Court quoted, with approval, from Mutual Life Insurance Company v. Gregg, 6 Cir., 32 F. (2d), 567, 568, a statement of the rule to be applied by an appellate court in passing on the question as to whether death was accidental or self-inflicted, as follows:

" 'The question for the reviewing court must be just the same as in any other kind of a law suit tried by a jury. Does the evidence, taken in the most favorable light for plaintiff, compel all reasonable men to accept the theory of suicide? If so, a verdict will be directed for defendant; otherwise not; and in this inquiry, as in every other case where the jury may rightfully refuse to accept that theory which is the natural and prima facie correct inference from all the facts, there must be some other theory fairly reconcilable with the admitted facts, and which is reasonably possible rather than merely fantastic.' "

In an Annotation on the subject of "Right of insurer to directed verdict on issue of suicide" (37 A. L. R., page 171, et seq.), the Annotator cites numerous adjudged cases as supporting the following statement:

"Although in all jurisdictions the courts apparently recognize the existence of a strong presumption against suicide, the presumption is rebuttable, and it is held that an insurer setting up suicide of the insured as a defense to a recovery on a policy may be entitled to a directed verdict in its favor on the issue of suicide, if the evidence produced is so clear and conclusive as to overcome the presumption and leave no reasonable basis for a jury to arrive at any other conclusion than that of suicide. Under such conditions the issue of fact is no longer one for the jury to speculate on, and should be decided by the court by means of a peremptory instruction to render a verdict for the insurer.

"So, where all the evidence produced on the trial overcomes the presumption, convincingly indicates suicide, and is inconsistent with accident or murder, the insurer is entitled to a directed verdict on the defense of suicide."

Bearing in mind the foregoing rules of law and practice in their application to the instant case, we have carefully examined and considered all the evidence in the record, and we are of the opinion that the hypothesis that Denton's death was accidental, is not supported by any substantial evidence, and is inconsistent with the undisputed facts.

The only theory advanced on behalf of plaintiff is that Denton might have "breeched" the pistol, and thereby fired it, while engaged in looking into the barrel to see if it was clean, and that at that instant something on the side—"a little bird maybe"—attracted his

attention and caused him to turn his head, and the bullet entered the side of his head.

To entertain the suggestion just stated would be to recognize mere conjecture in opposition to substantial evidence of suicide. It is not reasonably conceivable that, in the manner thus surmised, a bullet would or could have been fired into Denton's head an inch behind and slightly higher than his left ear and ranged slightly upward and slightly forward through his head. The location and range of the bullet-wound point irresistibly to the conclusion that the shot was voluntarily fired by Denton, and exclude any reasonable conclusion except suicide.

The other undisputed facts in evidence (which we have hereinbefore stated and need not repeat) are consistent with and forcefully tend to confirm the conclusion thus compelled by the location and range of the bullet wound.

We are of opinion that the undisputed facts and circumstances in evidence are inconsistent with any reasonable hypothesis of death by accident, and the presumption against suicide is "displaced" by evidence which leaves no room for any reasonable hypothesis but suicide. Provident Life & Accident Insurance Company v. Prieto, supra, page 168, 83 S. W. (2d), 251; Frankel v. New York Life Insurance Company, 10 Cir., 51 F. (2d) 933; New York Life Insurance Company v. Bradshaw, 5 Cir., 2 F. (2d), 457; Agen v. Metropolitan Life Insurance Company, 105 Wis., 217, 80 N. W., 1020, 76 Am. St. Rep., 905; Life & Casualty Insurance Company v. Andrews, 149 Miss., 306, 115 So. 548; Burkett v. New York Life Insurance Company, 5 Cir., 56 F. (2d), 105; Love v. New York Life Insurance Company, 5 Cir., 64 F. (2d), 829; Mutual Life Insurance Company v. Greggs, 6 Cir., 32 F. (2d) 567; Warner v. Equitable Life Insurance Company, 219 Iowa, 916, 258 N. W., 75; Despiau v. United States Casualty Company, 1 Cir., 89 F. (2d), 43; Home Life Insurance Company v. Miller, 182 Ark., 901, 33 S. W. (2d) 1102; Prudential Insurance Company v. Tuggle's Adm'r, 254 Ky., 814, 72 S. W. (2d), 440.

We conclude that the learned trial judge erred in overruling the defendant's motion for a directed verdict at the close of all the evidence, and defendant's assignments of error are sustained.

It results that the judgment of the Circuit Court is reversed, the verdict of the jury is vacated and set aside, and the plaintiff's suit is dismissed. The costs of the cause, including the costs of the appeal, will be adjudged against the plaintiff Mrs. Frances Denton.

Crownover and Felts, JJ., concur.