IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE

# RETTA ELROD, ET AL. v. J.C. PENNEY LIFE INSURANCE COMPANY

**Appeal from the Circuit Court for Jackson County**
**No. 1266-0-238      John D. Wootton, Jr., Judge**

---

**No. M1999-02195-COA-R3-CV - Decided June 22, 2000**

---

The plaintiff's son was insured under an accidental death policy issued by the defendant, which named the plaintiff as beneficiary. After the son shot himself, the plaintiff sought to recover under the policy, claiming the shooting was accidental. The defendant insurer denied coverage on the ground that the death was a suicide. The trial court found for the plaintiff and the defendant commenced this appeal. Because the defendant failed to satisfy its burden of proving suicide, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed and Remanded**

COTTRELL, J., delivered the opinion of the court, in which CANTRELL, P.J., and CAIN, J., joined.

Lane Moore and Daniel Rader, III, Cookeville, Tennessee, for the appellant, J.C. Penney Life Insurance Company.

Jacky Bellar and Brandon Bellar, Carthage, Tennessee, for the appellee, Retta Elrod.

**OPINION**

Marvin T. Elrod, the plaintiff's son, was insured under an accidental death policy issued by the defendant, J.C. Penney Life Insurance Company ("the insurer"). The plaintiff, Retta Elrod, was the beneficiary of the policy. After Mr. Elrod died, Mrs. Elrod sought to recover under the policy, claiming the death was accidental. The insurer denied coverage on the ground that the death was a suicide.

Mr. Elrod died of a gunshot wound to the head on January 5, 1997 at age 50. After the shooting, Mr. Elrod was found lying on a couch with a pistol in his hand and his thumb in the trigger guard. Mr. Elrod's hand, holding the gun, was resting at his waist and the barrel of the gun was facing toward his shoulder. The bullet entered at the bridge of his nose between his right eye and nose, causing bruising at the site. The death certificate listed the cause of death as "undetermined." The form certificate listed various options, including suicide, leading us to conclude that the medical examiner was not convinced the death was the result of suicide.

On May 7, 1997, Mrs. Elrod, seeking to recover under the policy, sent the insurer the following letter:

Claims Department:

I am the Mother of Marvin Thomas. I was sitting in the chair not far from the couch that he was sitting on in the same room at least 3 or 4 ft from him. He had been working on the gun with a pair of pylers [sic] and also wipeing [sic] the gun with a cloth. Next thing I knew I seen Blood running OFF his cheek then I went for help.

The insurer denied her claim, asserting that Mr. Elrod was excluded from coverage because his death was a suicide rather than accidental. Mrs. Elrod sued the insurer, seeking to recover $50,000, the full amount of coverage, and a 25% bad faith penalty.

At the trial, both parties presented two witnesses. Mrs. Elrod, who was 81, deaf, and responded only to written questions, testified that she was with her son at the time of his death, but did not see him pull the trigger. She stated that on the day of his death, her son had been in a good mood. She testified that after they attended church and ate dinner, her son had been "fooling with a gun." When asked why the death should be considered an accident, Mrs. Elrod testified that she "did not know why but he was just cleaning with the gun and doing around." At trial, Mrs. Elrod testified that her son had been using gun cleaning materials. When asked if she saw the "wire pliers," however, Mrs. Elrod answered in the negative. The insurer asserted that this testimony was inconsistent with the following statement she made during her deposition:

I was sitting there reading the paper and I heard the gun go off. And I didn't know he had a gun until I heard it go off. And that's all I knowed then. I don't know nothing else to tell you. I don't believe he'd have shot hisself in the face, though, like that. It was just accidental. He was fooling with that old gun that wasn't fit to fool with. . . . I was just seeing him when I was reading the paper, . . . I thought he was working on something but I didn't know what. And I read the paper while he was working, like I do every night nearly. That's all he does is gather up something and bring it in and work on it. He had that accident with that gun.

Mrs. Elrod's second witness was a representative from the insurance company, Mr. Costa, who admitted that Mr. Elrod's death certificate stated that the manner of death was "undetermined."

The defense then called the investigating deputy, Kenneth Bean, who testified about the position of the body and his observations of the surrounding area. Mr. Bean testified that hair, blood, and flesh residue were found on the tip of the barrel and that gun powder was evident around the wound. The officer related that the wound was below the right eye at the bridge of the nose. Although Mr. Bean stated that he saw no gun cleaning supplies near the body, he

admitted on cross examination that a pair of vise grips had been sitting on the floor near Mr. Elrod. He also admitted that when he found it, the gun had been jammed by a casing "where it wouldn't recoil and let it reload" and the clip was in when he found it. He agreed that to get a good look down the barrel, one could press it up to his eye. Mr. Bean testified that he told the insurer that the cause of death was suicide.

The second defense witness was Dr. Charles Harlan, a forensic pathologist, and the Assistant County Medical Examiner of Jackson County. To prepare for the case, he reviewed photos of the scene taken during the initial investigation, the police report, and Mr. Elrod's medical history. He did not examine the body and was not consulted by county officials on this case. He concluded to a reasonable degree of medical certainty that Mr. Elrod committed suicide. The doctor testified that this conclusion was based solely on the photos, particularly the star-shaped or "stellate" pattern of the powder at the entry wound, which purportedly showed that the gun was tightly pressed against the face when it fired. He also testified that the photos showed that Mr. Elrod used his thumb to pull the trigger. The doctor stated that Mr. Elrod's medical history confirmed his conclusion, pointing to a 1974 hospital record which reported that Mr. Elrod had attempted to hang himself while incarcerated and had attempted to overdose on his medication a week before that incarceration.

Through Dr. Harlan, the defense admitted records from a 1993 hospitalization which stated that Mr. Elrod:

> has grown increasingly paranoid and fearful of others and he is talking about dying. He believes he is going to die, and there was at least one statement where he talked about wanting a gun to die.

On cross examination, the doctor admitted that a 1995 hospital record stated that Mr. Elrod had no history of suicide attempt. Medical records from 1996 stated that Mr. Elrod would do whatever was necessary to protect himself.

Based on the evidence from these four witnesses and the exhibits, the trial court found "that the death of Marvin T. Elrod was accidental within the meaning of the insurance policy" and ordered that Mrs. Elrod recover $50,000. The court disallowed the bad faith penalty. This appeal ensued.

As a preliminary matter, we turn to the applicable standard of review for the sole issue presented in this appeal: whether the evidence was sufficient to support the trial court's judgment for Mrs. Elrod. Because this is an appeal from a decision made by the trial court following a bench trial, the standard set forth in Tenn. R. App. P. 13(d) governs our review. Thus, we must examine the record *de novo* and presume that the findings of fact are correct "unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d). Furthermore, great weight must be given to the factual findings made by the trial court that rest on determinations of credibility. *See Randolph v. Randolph,* 937 S.W.2d 815, 819 (Tenn.1996). The presumption of correctness requires us to accept the trial court's findings of fact unless the aggregate weight of

the evidence demonstrates that a finding of fact other than the one found by the trial court is more probably true. *See Estate of Haynes v. Braden*, 835 S.W.2d 19, 20 (Tenn. Ct. App. 1992) (holding that an appellate court is bound to respect a trial court's findings if it cannot determine that the evidence preponderates otherwise). For the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect. *See The Realty Shop, Inc. v. RR Westminster Holding, Inc.,* 7 S.W.3d 581, 596 (Tenn. Ct. App. 1999).

The standard of appellate review of factual determinations must, in this case, be applied in the context of the burdens of proof assigned by law to each party. In other words, our review of the trial court's finding that Mr. Elrod's death was an accident must include an analysis of whether the evidence preponderates against that finding when the evidence is weighed according to each party's burden.

The law in Tennessee establishes the burdens of proof for each party where, as here, the determinative issue is whether a death was due to accident or suicide. The beginning point is Tennessee's recognized presumption against suicide. This rebuttable presumption was adopted "out of deference to the well known fact that almost universally people love and will defend their lives vigorously, even desperately . . . ." *Provident Life & Accident Ins. Co. v. Prieto*, 169 Tenn. 124, 144, 83 S.W.2d 251, 259 (1937). This presumption affects the burdens of proof born by the parties in the following manner:

> (1) In a suit on an accident policy where the plaintiff can recover only for an accidental death, the affirmative of the issue is on the plaintiff from the beginning to the end of the trial, and the burden of proof in its general sense is on the plaintiff to show an accidental death.
>
> (2) This burden is met, and a *prima facie* case made out, when the plaintiff has shown a death by external and violent means under circumstances not inconsistent with accident.
>
> (3) Where a death by external and violent means is shown, and there is no proof as to how it was caused, or the attendant circumstances leave the question doubtful, or the proof concerning them is conflicting or not inconsistent with accident, the law presumes an accidental death, and the burden of proof, in its secondary sense, is cast on the defendant, and requires it to prove by a fair preponderance of the evidence that death was caused by suicide.
>
> (4) This presumption is not displaced by proof of circumstances which merely tend in a greater or less degree to show suicide, but

in such case it is a question for the jury whether they overturn the presumption.

(5) Where there is no proof indicating either accident or suicide in case of a death by external violence, or where the proof is equally balanced, or is conflicting, this presumption comes to the aid of the plaintiff, in making out his or her case.

(6) Where death by external violence is shown by facts or circumstances, inconsistent with accident, the presumption against suicide is displaced, and no longer continues to operate in favor of the plaintiff.

*Maddux v. National Life and Accident Ins. Co.,* 36 Tenn. 275, 277-78, 254 S.W.2d 433, 434 (Tenn. Ct. App. 1953) (quoting *Prieto*, 169 Tenn. at 167, 83 S.W.2d at 267).

In other words, the person seeking to recover under an accidental death policy has the initial burden of proving their entitlement to recovery under the policy, i.e., by showing that the insured's death was not the result of illness or natural causes but was, in fact, the result of an accident. Here, Mrs. Elrod presented evidence that her son died "by external and violent means under circumstances not inconsistent with accident."[1] *Id.* Mrs. Elrod made out a *prima facie* case with proof of the location of the wound, the jammed shell, the vise grips near the couch, and the facts that her son had been "messing with something" and had been in a good mood. The fact that the shooting occurred in Mrs. Elrod's presence also appeared inconsistent with suicide. *See id.* Implicit in the trial court's ultimate finding of accidental death is a finding that this proof left the question of suicide doubtful, or was not inconsistent with accident as the cause of death. Thus, the law would presume that Mr. Elrod's death was accidental.

---

[1]The policy did not define the term "accidental death." We apply the definition used in *Maddux,* that the death occurred by external and violent means under circumstances not inconsistent with accident. *See Maddux,* 36 Tenn. at 277-78, 254 S.W.2d at 434; *Harrell v. Minnesota Mut. Life Ins. Co.*, 937 S.W.2d 809, 814 (Tenn. 1996) (terms not defined in insurance contracts must be construed using their "common and ordinary meaning, with ambiguous language construed against the insurance company and in favor of the insured"). In *Harrell*, our Supreme Court rejected the rule that before a death will be considered accidental the means as well as the result must be involuntary, unexpected, and unusual. It held that:

if death is the unanticipated and unexpected result of an intentional, voluntary act, it is accidental in the ordinary and plain sense of the word and recovery is available under an accidental death insurance policy.

*Harrell*, 937 S.W.2d at 814.

The burden then shifted to the insurer to prove suicide by a preponderance of the evidence. Through Deputy Bean, the insurer presented photographs and testimony about the scene of the incident and position of the body. This evidence was not truly inconsistent with accident and did not dissipate the presumption. While Dr. Harlan unequivocally testified that the death was due to suicide, his opinion was based solely on photographs of the body and not an actual examination, unlike that of the medical examiner, who was unable to ascertain the cause of death. Dr. Harlan presented no new facts or circumstances, and simply offered his interpretation of the proof. The trier of fact, who was present at trial and thus well situated to weigh the evidence, chose not to rely on his opinion.

Having read and considered the entire record, we cannot say that the evidence preponderates against the trial court's decision. We cannot say that the reasonable probabilities from the evidence, in the light of reason and common sense, all point to suicide, and are inconsistent with any other theory. *See Maddux*, 36 Tenn. App. at 278, 254 S.W.2d at 434. This conclusion is consistent with *Maddux. See id.* In that case, as here, no direct evidence supported either the theory of accident or that of suicide. Both parties relied upon circumstantial evidence. The decedent in *Maddux* was found dead of a gunshot wound to the forehead caused by a shotgun. He habitually used the gun to shoot birds and was not unhappy in his home or business life. Based on this evidence, this court reversed the trial court's decision to direct a verdict for the insurer. *See id.*

The insurer relies on *Mutual Benefit Health & Accident Ass'n v. Denton*, 22 Tenn. App. 495, 124 S.W.2d 278 (Tenn. Ct. App. 1939) for the proposition that when evidence inconsistent with an accident is introduced, the presumption against suicide dissipates. *Denton,* however, is factually and procedurally distinguishable. In *Denton*, the decedent was discovered seated in an armchair in his office with a bullet wound slightly behind his left ear and a pistol in his hand. This court reversed the trial court's decision to deny the insurer's motion for directed verdict because the location of the wound precluded a finding that the decedent had been cleaning or otherwise working with the gun. *See Denton,* 22 Tenn. App. at 505, 124 S.W.2d at 284. Due to the placement of the wound and the decedent's recent bankruptcy, the evidence of suicide in *Denton,* unlike that in the case before us, was "inconsistent with any reasonable hypothesis of death by accident." *Id.* Thus, the presumption against suicide was "displaced" by evidence which left "no room for any reasonable hypothesis but suicide." *Id.* Here, the evidence was not so unequivocal. Proof merely tending to show suicide is not sufficient to rebut the presumption against it. *Id.*, 22 Tenn. App. at 502, 124 S.W.2d at 282.

Nor was the evidence of suicide here as strong as that in *Littleton v. Provident Life & Accident Ins. Co.*, 489 S.W.2d 41 (Tenn. Ct. App. 1972), another case on which the insurer relied. In *Littleton*, the decedent was discovered by her young daughter reclined sideways on her bed with her feet touching the floor and a gunshot wound to the chest. The gun had been stored unloaded and was not jammed. No gun fixing or cleaning implements were found near the decedent, who died of blood loss during surgery. The gun was in good mechanical and operating condition and would not fire, either from a normal or cocked position, unless the trigger was pulled. The location of powder burns on the clothing, the wound, and the spent bullet found in

the bottom mattress made it clear that the decedent had lain back on the bed, placed the gun to her breast, and pulled the trigger. This court observed that "[i]t is most improbable that a person would hold a gun perpendicular to her chest, while she looks down the barrel to see if it is loaded." *Id.* at 44. This court found the evidence of suicide so forceful "as to exclude any reasonable conclusion except that Mrs. Littleton's death resulted from an intentional self-inflicted wound" and affirmed the trial court's decision to direct a verdict for the insurer. *Id.* Again, the evidence before us is not sufficiently forceful to exclude any reasonable conclusion except suicide, particularly given our obligation to give the trial court's decision on Dr. Harlan's credibility great weight.

Accordingly, the judgment of the trial court is affirmed. This case is remanded for any further proceedings which may be necessary. Costs are taxed against J.C. Penney Life Insurance Company, for which execution may issue if necessary.