MARY WARNER, Appellee, v. EQUITABLE LIFE INSURANCE COMPANY, Appellant.

No. 42561.

DECEMBER 11, 1934.

REHEARING DENIED MAY 17, 1935.

Henry & Henry and Cory & Sackett, for appellant.

H. E. Narey and Cornwall & Cornwall, for appellee.

(This opinion written by Judge CLAUSSEN is adopted by the court.)

CLAUSSEN, J.—The defendant insurance company issued a policy of insurance on the life of Elihue C. Warner, the husband of plaintiff, in which plaintiff was designated beneficiary. The policy was dated October 11, 1932. The insured came to his death on April 26, 1933, less than a year after the policy was issued. The policy contained a provision that if, within one year from the date of the policy, the insured committed suicide, whether sane or insane, the liability of the company should be limited to the amount of the premiums paid on the policy.

The case was tried to a jury which found for plaintiff, and from judgment thereon the defendant company appeals.

A number of errors are assigned, but in the view we take of the record, only one requires attention. It is that the court erred in overruling a motion made by defendant for a directed verdict on

the ground that the record established conclusively that the insured committed suicide within one year from the date of the policy. It should perhaps be stated that the defendant offered to confess judgment for the amount of the premiums paid on the policy and that the motion contemplated judgment in favor of plaintiff in the amount of the premiums paid. A disposition of this question fairly calls for a full statement of the facts and circumstances surrounding the death of the insured.

The insured lived with his wife and children in a two-story house on a three-acre tract of land on the edge of the town of Spirit Lake. The kitchen occupied the northeast corner of the ground floor of the home. To the south of the kitchen was the dining room. West of the dining room was a living room. Access was had to the upstairs by means of a flight of steps which opened on a passageway leading from the dining room to a room in the northwest corner of the house, also designated as a living room. In order to go from the kitchen to the upstairs, it was necessary to first pass through the northwest part of the dining room. It was not possible for one in the southwest living room to see into the kitchen or observe the entrance to the stairway. In the spring of the year 1933, a large bed of strawberry plants had been set out to the east of the house, and, as many times happens, was a favorite resort for the neighbor's chickens. The presence of the chickens in the strawberry patch was a source of great irritation to the insured, and we may add at this point, for the purpose of satisfying curiosity concerning the relevancy of these facts, that it was contended by appellee that the insured accidentally shot himself while preparing to shoot the chickens.

The record fairly establishes that on the morning of the day of his death the insured was heavily under the influence of liquor. At about 9:30 in the forenoon he left his home on foot and proceeded to the neighbors across the road. From there he went to another neighbor's home. Some time later, but at a time not revealed by the record, one of the insured's sons drove over to the neighbor's house where he found his father seated on a chair in the kitchen. He was evidently quite drunk for it was necessary to lift him out of the chair and escort him to the car. Upon arriving at home, the son left the father sitting in the car. The son went into the southwest living room and turned on the radio. From where he was seated, he could not see into the kitchen or observe the entrance

to the stairway leading upstairs. In a little while the son heard his father come into the kitchen and a few minutes later heard his father go upstairs and return shortly to the kitchen. Subsequent events disclosed that while upstairs the father had procured a 25-caliber Colt automatic pistol from a trunk and taken it with him into the kitchen. What transpired upon the return of the father to the kitchen is thus described by the son, who was the only person in the house:

"Then I heard kind of a sudden noise like a hitting of some-thing, kind of a thump. It was a heavy noise. It sounded as if he had tipped the stool over and the stool had hit the floor. At that moment I heard a gun go off."

It may be well to locate the kitchen furniture at this time. A large kitchen range stood in the northeast corner of the room, parallel with the north wall. The oven door dropped down when opened. The oven door was open at the time. Near the center of the room was a table. In the kitchen were also a chair, a stool, and a washing machine. The location of the chair and stool are not re-vealed by the record. Neither does the record show that either the chair or stool were overturned or out of place. The washing ma-chine was in the southwest corner of the room. The kitchen door was in about the center of the east wall of the kitchen,—to be exact, the space between the north side of the kitchen door and the north wall was six feet nine inches. The kitchen range stood one foot seven inches from the east wall, and two feet seven inches from the north wall. As the range stood, it was one foot ten inches in width, measured north and south, and two feet eight inches long. The oven door opened downward and was sixteen inches in width. From these dimensions, an accurate conception can be formed of the proximity of the oven door to the outside door. The kitchen door was hung on the south jamb of the door frame, making the door swing in the direction opposite the range when opened. Inferentially it appears that the outside door was closed.

After hearing the shot, the son went to the kitchen. He thus describes the situation:

"I ran to the kitchen and my father was lying on the floor; the oven door to the kitchen range was down. He was lying on his right side with his face toward the north and his head was about six inches from the door. His knees were contracted. His head

was southeast and his body extended northwest. His right arm was kind of underneath his body.. * * * His legs were extending almost to the stove. * * * He was lying on his hand and the gun."

The son called in a man who was working for a neighbor who described the position of the body on the floor as follows:

"Mr. Warner was lying on his right side with his right arm under him and his head toward the outside kitchen door. It was in a sort of an angle with his head to the southeast and his feet to the northwest. His hand was back of him enough so that you could see the gun beneath him and back of him. His knees were bent."

The significance of the direction in which the body lay is that the feet extended toward the kitchen range with its open door.

A physician was summoned and arrived before the body was disturbed. His description of the position of the body tallies with that of the other witnesses. He took the gun from the hand of the dead man. He says:

· "When I took the gun from his right hand I found the index finger inside of the trigger guard and adjacent to the trigger. The second and third fingers were on the inside of the stock. The little finger was below the stock and the thumb over it, the rear of the stock against the inside of the hand and between the thumb and forefinger."

The gun was a 25-caliber automatic pistol. It had a safety catch on the side which had to be disengaged before the gun could be fired. It also had a safety device in the angle at the rear of the stock or grip where the stock joined the barrel mechanism. The gun could not be discharged by pulling the trigger unless this device was pressed into the stock. This device would naturally be depressed if the gun was held in the hand in firing position. On the whole, the record establishes that the gun could not be discharged accidentally unless held in the hand in firing position.

The physician testified that the bullet, which produced the death of the insured, entered the right side of the head about an inch above and half an inch forward of the right ear and came out on the left side, almost directly opposite the point of entry. The son also testified concerning the wounds in his father's head. He said: "It (the bullet) went right through the temple and came out in front of the ear, above the ear, in a sort of angling direction." Neither

the physician nor the undertaker, both of whom were witnesses, testified to any bruises or abrasions on any other part of the body.

The area surrounding the wound on the right side of the head was discolored by powder burns. The physician testified to experience and experiments in relation to powder burns. He gave it as his conclusion that the weapon was fired at a distance of from three to six inches from the wound.

It is the position of appellee that the deceased procured the gun for the purpose of shooting the chickens in the strawberry patch, as he had frequently threatened doing, and, as the record discloses, he had several times threatened doing the morning of his death; that he stumbled; and that the gun was accidentally discharged. On the other hand, appellant contends that the record establishes conclusively that the insured committed suicide.

Appellee asserts that the fact situation aided by the presumption against suicide makes a fact question for the jury.

Human beings do not ordinarily commit suicide. Love of life is strong. These facts are well known to the courts. There is a presumption that death is not due to suicide. But the existence of such presumption does not create a legal situation in which the question whether the decedent committed suicide must invariably be submitted to the jury. This presumption is one of a large class. This court has frequently held that the existence of a presumption does not require that the question whether the presumed fact exists be always submitted to the jury. Courts of other jurisdictions are almost in unison in adhering to this view. Courts and judges are not in accord in the language in which this view is expressed nor in the theories which support their conclusions. The rationale which appeals to the writer was recently set forth in Beggs v. Metropolitan Life Ins. Co., 219 Iowa 24, 257 N. W. 445. The rule is firmly established that when the nonexistence of a presumed fact is conclusively established by the record, the existence of the presumption does not make a jury question as to whether the presumed fact did or did not exist. Gavin v. Des Moines Life Ins. Co., 149 Iowa 152, 126 N. W. 906; Schaefer v. Insurance Co., 133 Iowa 205, 100 N. W. 857, 110 N. W. 470; Kauffman v. Logan, 187 Iowa 670, 174 N. W. 366; Brogan v. Lynch, 204 Iowa 260, 214 N. W. 514.

In this situation we turn our attention to the question whether the record, aided by every intendment in favor of appellee, can support a finding that the insured met an accidental death.

The record reveals a situation in which the insured was a source of care to his family. The children testified that when the father was intoxicated, they asked him for money which he then gave freely, which they returned to him when he was sober. On the morning of the shooting, the son went to the neighbors with the car for the purpose of getting his father. He seems to have known where to go. At the neighbor's he found his father seated on a chair in the middle of the kitchen with his head on his hands, deeply intoxicated. When they got home, the son left the father seated in the car. The whole picture is one of a type of men who are frequently most despondent.

Considering the make of the gun and its safety devices, the fact that the shot was fired while in the kitchen before the insured had arrived at a place where he could shoot at the chickens, the position in which the body lay, the position in which the. gun must have been held when fired, the absence of evidence that the chair or stool in the kitchen had been disturbed, and the absence of evidence of bruises or abrasions of the skin such as usually result from contact with oven doors, the conclusion cannot be escaped that the decedent was a suicide. See Green v. New York Life Ins. Co., 192 Iowa 33, 182 N. W. 808; Inghram v. National Union, 103 Iowa 395, 72 N. W. 559; Beverly v. Supreme Tent of Maccabees, 115 Iowa 524, 88 N. W. 1054; Gavin v. Des Moines Life Ins. Co., supra. The trial court should have sustained defendant's motion for a directed verdict.—Reversed.

STEVENS, ALBERT, ANDERSON, EVANS, and KINTZINGER, JJ., concur.

MITCHELL, C. J., dissents.