ALBERT LATHAM, JR., Appellant, v. DES MOINES ELECTRIC LIGHT COMPANY, Appellee.

No. 45396.

FEBRUARY 18, 1941.

REHEARING DENIED JUNE 20, 1941.

Stipp, Perry, Bannister & Starzinger, for appellant.

Bradshaw, Fowler, Proctor & Fairgrave, for appellee.

OLIVER, J.—In April 1939, plaintiff purchased a lot at the southeast corner of the intersection of West Fourth Street and Grand Avenue, Des Moines, Iowa, upon which was a three-story brick store and apartment building, erected in 1901. The north front of this building extends east along the south side of Grand Avenue from West Fourth Street to the alley which intersects the block.

On August 10, 1939, a large part of the foundation of this north front was torn out, apparently by storm water which escaped from Bird's Run Sewer. The collapse of about sixty feet of the north wall of the building, with attendant damage, resulted. Thereafter, plaintiff brought this action at law against defendant, Des Moines Electric Light Company, for damages, alleging it was negligent in constructing and maintaining a conduit which intersected and partly blocked said sewer. Trial to a jury resulted in judgment against plaintiff by directed verdict and he appeals.

Bird's Run Sewer runs in a general southeasterly direction and carries storm waters from the district traversed by it into the Des Moines river several blocks east of plaintiff's property. In the three-fourths mile between its beginning and plaintiff's property it has a fall of forty-two feet. The city had, by 1895, entirely enclosed it with limestone walls, a brick top and floor of oak plank. Later some portions of this floor had rotted out or had been washed out and had been patched with cement. Other spots were left covered with loose rock. At the place in question the interior dimensions of the sewer were eight feet by eight feet with perpendicular walls of limestone set in cement to a height of four feet, above which was a brick semicircular arch or crown, three bricks in thickness. Except for the arched top the sewer was the shape of a square. It ran south and a little

east as it crossed Grand Avenue running toward the approximate center of the north wall of plaintiff's building. Near the south side of the avenue it turned forty-seven degrees toward the east and ran partly under the northeast corner of said building, which, at that place, was supported by steel I-beams. These I-beams rested upon piers at the sides of the sewer and crossed over the sewer above its top. Defendant's conduit ran east and west along and under Grand Avenue, about ten feet north of said building, and intersected the southwest or south wall of the sewer about sixty feet west of the northeast corner of the building. At this point the sewer had partly completed its turn and ran somewhat south of east so that the conduit crossed through it diagonally.

The conduit contained electric wires and cables and had been first placed in the street in 1900. At this place the top of the sewer was only a short distance below the pavement and there was insufficient room between the sewer and the pavement to accommodate the conduit in the form desired by the Electric Company, which secured consent of the city to cut into and occupy approximately twelve inches of the top of the sewer. However, the conduit, as actually laid into and across the sewer, occupied the top forty inches, or about two fifths of the face area of the sewer. In 1916, the grade of the street was lowered, and defendant, with the consent of the city engineer, added another section to the side of the conduit, the vertical depth of which was not changed. Thus the conduit, with its supports, formed a solid rectangular box, twenty-four inches wide, which crossed the sewer diagonally and completely blocked its upper forty inches.

On August 10, 1939, there was a very heavy, but not unprecedented, fall of rain. During this rain the first indication of trouble observed was water spraying up five or six feet from a crack in the cement sidewalk about twenty-five or thirty feet west of the northeast corner of the building. Next a piece of sidewalk, ten or fifteen feet long, fell in. Soon after another piece of sidewalk and an electrolier fell. In the hole under the sidewalk the water was "rushing and swirling", "a young river running loose—boiling and flowing along", carrying debris. It was "hit-

ting up against the foundation of the building.'' The pavement in the street was sinking and some of it disappeared. Shortly afterwards the north wall of the building began to sag and crack and the east half of this wall, except a few feet at the east end, fell a few hours later. Under this part of the wall the entire foundation and several feet of underlying earth had been washed away.

After the water subsided it was disclosed that the entire southerly wall of the sewer (about sixty feet) between the conduit and the building line had been washed away, and the top of the sewer had fallen in. The bottom of the sewer beneath the conduit had been gouged out and washed out to a depth of about two feet. Downstream from the conduit, throughout the length of the sixty-foot break in the southerly wall of the sewer, most of its floor had been washed out and in places the bottom was gouged out one to two feet in depth, although there were places where some of the floor, old planks and concrete remained. The northerly wall of the sewer was in good condition.

Fragments of green weeds were hanging to the north side of the conduit near the top of the sewer, apparently deposited there by the water. Upstream from the conduit the sewer was not broken and appeared to be in good condition, except for some places in the floor where the planks had rotted out. Forty or fifty feet above the conduit a 24-inch water pipe crossed the sewer fifteen inches from its top and still further north a 15-inch gas pipe crossed through the sewer. The sewer did not wash out around these obstructions. There was no indication of any failure of the sewer either above or below this sixty-foot broken section between the conduit and the northeast corner of plaintiff's building.

When the sewer was carrying less than three fifths of its capacity the conduit had no effect upon the flow, which would be rather rapid due to the substantial grade. It was only at times when the sewer was more than three-fifths full that the flowage could be affected thereby. Experts testified to a general rule of hydraulics that when water meets an obstruction along a straight line such as this conduit, the obstruction tends to change the course of the water to a direction at right angles to said obstruc-

tion. In other words, if water was flowing diagonally across such obstruction, it would tend to turn and go at right angles to it. Accordingly, this east and west rectangular obstruction would tend to cause the water to swoop downward against the bottom of the sewer and against its south wall immediately beyond the obstruction. The damming-up effect of this obstruction would also result in an increase in the velocity of the water at this place which would increase erosion in the bottom and on the south wall. Water does not necessarily recover its normal flow or regain its normal velocity after it passes an obstruction. In fifty years a sewer will wear considerably if the water carries gravel and sand. A scouring effect in the sewer might take place in a very short time. Even without any obstruction there would naturally be an increased pressure against the sewer wall at the bend.

An engineer testified:

"There is a material reduction in the capacity of this sewer because of this conduit that ran across. I think it did increase the pressure on the south wall. It increased it there because of the bend. * * * The bend is one contributing cause."

When asked a hypothetical question as to his opinion as to the probable cause of the failure of the sewer wall and the falling of the building, he answered:

"Well, under the conditions stated and as observed by myself on the ground, it is my opinion that the major factor in the failure of the sewer can be attributed to the obstruction within the sewer."

A hydraulic engineer of extensive technical training and international experience in that field testified that ordinarily obstructions in the flow of water tend to increase velocity at that particular point which is usually followed by decrease in pressure at that immediate point but might result in increased pressure downstream from it. Tests he made with a scale model of this sewer indicated one of the effects of the conduit was to increase pressure on the southerly wall at the turn. Referring to a hypothetical question, he testified:

" * * * in my opinion, it is probable that the fact that this

conduit was there was the major producing cause for the washing out of the sewer wall, for this particular event. I doubt if other conditions could have produced things which happened exactly as this did. * * * I would not say that there were not other causes which acted together with it to a lesser extent.''

Experts on both sides substantially agreed as to the effects of an obstruction upon a flow of water. However, defendant's experts expressed the opinion that the force of the water would not be sufficient to break the sewer. An expert for defendant expressed the opinion there was pressure on the outside of the side walls of the sewer from the supporting piers at the northeast corner of the building, and that if the sewer wall was washed away or failed that would destroy the support at the corner of the building. The propositions involved in this appeal are the sufficiency of proof of negligence and proximate cause to make the case one for the jury.

I. Was the proof of negligence sufficient to make that issue a jury question? In considering this proposition it should be first said that one who obstructs the flow of water in a public drain may be negligent in so doing. Powers v. Council Bluffs, 50 Iowa 197. The flooding in the Powers case was immediately caused by brush and debris lodging against a box covering a gas pipe. In the case at bar the sewer was completely enclosed and presumably received its water from catch basins which did not permit large articles to enter and apparently rendered improbable the blocking of the sewer by the lodgment of foreign bodies.

The function of a public storm-water sewer is to gather and carry away storm water and it may be inferred that substantially its entire capacity is, from time to time, required for that purpose. A licensee, public service corporation, which, for purposes foreign to the regular functions of such sewer, places or maintains an obstruction therein should, in so doing, exercise reasonable care to prevent injury to others resulting therefrom. See City of Des Moines v. Des Moines Water Co., 188 Iowa 24, 175 N. W. 821. Reasonable care is care commen-

surate with the danger thereby entailed and requires the anticipation and guarding against such contingencies as are reasonably apparent and reasonably likely to occur. That is not to say that every partial obstruction of a sewer by a licensee would necessarily constitute negligence. But the licensee is negligent, if it obstructs said sewer in such manner as to reduce its capacity, modify its flowage, place additional strains upon it or otherwise affect it, to such an extent that injury to others is reasonably apparent and reasonably likely to result therefrom.

In this case the top forty percent of the sewer was blocked at a curve near its mouth and there was evidence tending to show that when the flowage was great the obstruction materially reduced the capacity of the sewer, increased the velocity and turbulence of the water and caused additional pressure on the sewer wall. There was also evidence that the effect of the conduit was such that it was probably the major factor in the failure of the sewer. Under the record in this case we think the proof of negligence was sufficient to make the same a question for the jury.

II. Plaintiff contends the evidence that the conduit was the proximate cause of the breaking of the sewer and resultant damage was sufficient to generate a jury question upon those matters. Reliance is largely placed upon the testimony of the experts as furnishing the necessary proof.

Apparently, no one had seen the inside of the sewer for some time previously, and, of course, no one actually saw it break. Largely on this account defendant contends the expert testimony was based upon conjecture, speculation and surmise and that the record evidence was insufficient to support it. But there was evidence of facts and circumstances bearing upon the condition of the sewer before the break, the occurrences during the flooding and the conditions found after the break. Based upon their technical knowledge, these witnesses testified that from such evidence, as stated in the hypothesis, they were able to form and express opinions as to the probable cause of the break. Under the record in this case, we, as nonexperts, cannot say that the factual foundation for the experts' opinions was insufficient as a matter of law.

■ In argument defendant suggests various possibilities concerning the break and its cause and points out that the sewer remained intact for many years after the installation of the conduit. This is merely a circumstance which possibly militates against plaintiff's theory of causation but does not necessarily render it untenable. Plaintiff was not required to prove his theory of causation by evidence so clear as to exclude every other possible theory. The evidence must be such as to make that theory reasonably probable, not merely possible, and more probable than any other hypothesis based on such evidence. If the jury believed plaintiff's experts and the supporting circumstances in the record, the evidence was sufficient to justify a finding that the conduit was the proximate cause of the break in the sewer. Whetstine v. Moravec, 228 Iowa 352, 291 N. W. 425.

■ But defendant urges that the form of the hypothetical questions asked plaintiff's expert witnesses called for answers which invaded the province of the jury. This proposition is not here presented in the form of exceptions to rulings upon objections made during the trial but the contention is that none of said questions and answers were in such form that they could be considered as evidence. The questions asked each expert called for his opinion as to the probable cause. One answer was, in part—"in my opinion, it is probable that the * * * conduit * * * was the major producing cause." Another expert answered, in part—"it is my opinion that the major factor in the failure of the sewer can be attributed to the obstruction." These answers although not in the exact language of the questions were fairly responsive thereto. The form of the questions and answers was not objectionable as invading the province of the jury. Kirby v. Railway Co., 173 Iowa 144, 155 N. W. 343; Justis v. Union Mutual Cas. Co., 215 Iowa 109, 244 N. W. 696; State v. Campbell, 213 Iowa 677, 239 N. W. 715.

We conclude the court erred in directing a verdict for defendant. Nothing herein contained should be construed as the expression of an opinion concerning the weight of the evidence. —Reversed.

HALE, C. J., and BLISS, STIGER, SAGER, and GARFIELD, JJ., concur.