ERNEST BILL and NORMA BILL, appellees, v. FARM BUREAU LIFE INSURANCE COMPANY, appellant.

No. 50774.

(Reported in 119 N.W.2d 768)

1216

FEBRUARY 12, 1963.

REHEARING DENIED APRIL 9, 1963.

O'Donohoe & O'Connor, of New Hampton, for appellant.

Donohue, Wilkins & Donohue, of New Hampton, for appellees.

THOMPSON, J.—The plaintiffs are beneficiaries in a policy of insurance issued by the defendant upon the life of their son, LeRoy Leo Bill, who died on January 12, 1961. Liability being denied by the insurer, this action was brought by the plaintiffs.

The defendant alleged that the death of the insured was the result of suicide, which raises the only substantial question in the case. There is no denial of the issuance of the policy or that it was otherwise in effect on the date of LeRoy Bill's death; nor is there any contention that the policy was not voided under its terms if death was brought about by suicide. The trial court held that the question of suicide was for the determination of the jury and submitted it accordingly. The jury returned its verdict for the plaintiffs, judgment was rendered on the verdict, and we have this appeal. The defendant contends it was entitled to a peremptory verdict; it raised the question in various ways, and also challenges certain rulings on evidence and instructions given the jury.

The evidence disclosed that LeRoy, a 17-year-old boy approximately five feet eleven inches tall, weighing about two hundred and eight pounds, had been employed as a farmhand by Howard Niedert, a farmer residing near Riceville, Iowa, since September 21, 1960. He did chores and all types of fieldwork, usually working with Mr. Niedert. He was furnished a room of his own and spent his weekends at home. He was a good and willing worker and was careful with machinery and good to the stock. He got along well with the Niedert children and was treated like one of the family. He appeared happy and content with his work. He was exceptionally strong, and liked to display feats of strength, such as breaking binder twine and boards with his hands. He sometimes tried to do tasks Mr. Niedert himself had been unable to do. While he did not have many close friends, no one disliked him and he enjoyed his family and friends. On the day of his death he stopped at a neighbor's home and asked them over to play cards. They could not come but made tentative arrangements to come over the next night. He had recently purchased his first automobile and, although it was a used model, was very proud of it. His health had been very good and he was not in debt. He had two or three guns and liked to hunt and fish. At a family gathering a few days before his death he made plans to do some ice fishing with his uncle.

On the late afternoon of January 12, 1961, he was engaged in doing the chores and, when Mrs. Niedert arrived home about

five o'clock she talked with him. She observed nothing unusual about him and he went on about his tasks. She later saw him riding a saddle horse driving the cattle from the pasture, and that was the last anyone saw him alive. Apparently all the chores had been done except for the task of throwing down some hay or straw from the barn loft.

When Mr. Niedert arrived home about six o'clock that evening, LeRoy had not returned to the house for his evening meal. When the lad had not appeared by 6:30 Niedert went to look for him and observed a light on in the barn. Upon entering the door he saw LeRoy's legs extending through a small opening 22″x20″ in the floor of the haymow, used to lower bales of hay and straw for the stock. He thought LeRoy was sitting on the loft floor asleep, until he climbed the ladder in another chute to the floor above. Then "he could see the string to him and went over to him." The "string" was a piece of binder twine tied to an overhead two- by eight-inch beam some five feet and eleven inches above the floor, and attached to LeRoy's neck by a noose. Mr. Niedert felt the boy's neck, realized it was too late to give him aid and returned to the house. The authorities and LeRoy's parents were called and arrived a short time thereafter.

LeRoy's parents, the plaintiffs herein, arrived first but only Mr. Bill entered the barn. He went no closer than the top of the ladder to the second floor and then returned to the house. When Deputy Sheriff Don L. Powers and Dr. Willis K. Dankle, the county medical examiner, arrived they went to the barn loft and found LeRoy's body as Mr. Niedert had discovered it. They cut the twine and laid the lad on the loft floor to await the undertaker. When they did so there was a sudden expulsion of air from the lungs indicating LeRoy had held his breath until a stricture on the windpipe caused by the twine prevented its escape. The noose was tied with a square knot, not a slipknot. The body was almost straight with the legs extending through the opening in the floor, and the hands to the side on or near the loft floor as though he had pushed off from a sitting position. The body from approximately the knees up was above the bottom part of the opening. The noose around his head was 29 inches in circumference and the knot was against

his cap, which was still on, not against his head or neck. There was no indication of a struggle and the chaff around the hole was not disturbed.

It also appeared there was another piece of binder twine attached to the same beam. It had been broken, and nearby was a piece of twine with a noose tied with a slipknot, which plaintiffs maintain disclosed a prior unpleasant experiment terminated by LeRoy's ability to break the twine with his hands.

It further appeared many pieces of twine were hung in the loft, for the bales of hay and straw were usually opened there. No rope was kept in the loft but some was in the barn, and LeRoy knew where it was and how to use it. Thus plaintiffs contend if he had wished to hang himself he would not have depended upon small binder twine, but would have used a strong rope and a larger opening to have accomplished the deed.

The medical examiner testified the twine would have broken had LeRoy stepped off into the hole, and that he had to let himself down carefully, that death was caused by asphyxiation, that the asphyxiation was due to the constricting twine around the neck, that pressure on the throat applied in this manner "could cause practically immediate unconsciousness", and that if the immediate unconsciousness had not ensued, there would have been a gradual strangulation, with a struggle resulting. This a resolute will could overcome, but normally a person would struggle. It was the examiner's opinion "that the injury involved was self-inflicted."

The evidence further disclosed that LeRoy had finished the eighth grade with some difficulty, that intelligence tests showed him below average, that he desired to follow farm work, was a member of the Alta Vista Lutheran Church, and drank neither beer nor alcohol. He was a happy-go-lucky fellow, liked to watch television, and seemed to all witnesses who observed him near the date of this tragedy to then be his normal self. Mr. Niedert and Mr. and Mrs. Bill testified they knew of no reason why LeRoy might intentionally take his life.

I. The defendant contends that the record facts make such a clear case of suicide that it was entitled to a directed

verdict. The burden was upon it to support its affirmative defense, and it thinks it did so. We have held in proper cases that suicide may be so clearly shown that the trial court should hold it established as a matter of law. Inghram v. National Union, 103 Iowa 395, 72 N.W. 559; Beverly v. Supreme Tent, 115 Iowa 524, 88 N.W. 1054; Gavin v. Des Moines Life Ins. Co., 149 Iowa 152, 126 N.W. 906; Warner v. Equitable Life Ins. Co., 219 Iowa 916, 258 N.W. 75.

But generally the question of suicide has been held to be for the jury. The plaintiffs' case is fortified by the presumption against suicide. We have said "The presumption against suicide is a strong one." Brown v. Metropolitan Life Ins. Co., 233 Iowa 5, 10, 7 N.W.2d 21, 24. We have also held that it has the effect of evidence. Brown v. Metropolitan Life Ins. Co., supra; Allison v. Bankers Life Co., 230 Iowa 995, 999, 299 N.W. 889, 891; Reddick v. Grand Union Tea Co., 230 Iowa 108, 119, 296 N.W. 800, 805.

The presumption is based on inferences arising from the known love of life and the instinct of self-preservation, the fact that suicide is opposed to the general conduct of mankind and that it involves moral turpitude. While the presumption is not conclusive and may in exceptional cases be overcome as a matter of law, this is not ordinarily so; and it may be strengthened by other evidence tending to show lack of motive for suicide or other facts which would make it unlikely.

We have discussed this question often. Holloway v. Bankers Life Co., 248 Iowa 517, 527, 81 N.W.2d 453, 459; Brown v. Metropolitan Life Ins. Co., supra; Michalek v. Modern Brotherhood of America, 179 Iowa 33, 42, 43, 161 N.W. 125, 129; Tackman v. Brotherhood of American Yeomen, 132 Iowa 64, 68, 106 N.W. 350, 351, 8 L. R. A., N. S., 974. In the latter case the facts were to a considerable extent similar to those in the case at bar. There the decedent-insured was found hanging in the barn from a harness strap. There was some evidence that he had some financial and health difficulties; but we held the question of suicide was for the jury.

In the instant case, the facts would undoubtedly support a verdict of suicide; but they do not require it. No motive

for suicide appears. There is evidence that LeRoy Bill was proud of his strength; that he had made plans for the ensuing evening; he had no worries, financial or otherwise; he seemed to enjoy or at least be satisfied with his work. An inference that he was trying some sort of experiment to test and prove his strength in breaking the twine placed around his neck, and that it in some manner went wrong, is not too remote. To strengthen this there is the medical testimony that it would be possible the pressure on the throat could have caused instant unconsciousness. And it is also a fair argument that if he had intended suicide he would have used a stronger rope rather than the binder twine. All of these things strengthen the presumption against suicide, and support the trial court in its submission of the case to the jury. We find no error at this point.

■ II. Further error is assigned upon the refusal of the trial court to admit the testimony of the medical examiner, Dr. Willis K. Dankle, as to a conversation he had with plaintiff Ernest Bill in the presence of the other plaintiff, Norma Bill. Doctor Dankle testified that he had such a conversation at the Niedert farm on the evening after the death of LeRoy Bill. To the question "What was said at that time?" he answered "I asked him if there were any doubt in his mind that his son committed suicide." Then came a motion from plaintiffs' counsel to strike "as a conclusion and opinion on his part, in no way binding on this plaintiff, and certainly improper in a civil suit, what the man said at the time, what the doctor said." The court said: "Well, I think that originated with this witness and not with the plaintiffs. I think under the—". Taking this as an expression of intent to sustain the motion to strike, defendant's counsel said "Your Honor, we would like to make an offer of proof in chambers." This was agreed to by the court, and later, in chambers, Doctor Dankle was interrogated in this way:

"Q. Doctor, did you have a conversation with Ernest Bill in the presence of Norma Bill at the Niedert farmhouse just before you left on the night of January 12th? A. Yes. Q. What did that conversation consist of in your part and on his? A. I said to Mr. Bill, 'Is there any doubt in your mind that your son committed suicide?' and if I might describe the situa-

tion, he and his wife were sitting at the table, mourning and tearful, and he just shook his head. Q. In what direction, Doctor, if you will say it so that the record can pick it up? A. A lateral motion of the head. Q. That is commonly interpreted as a negative sign? A. Which I interpreted as a negative sign."

No objections were lodged by the plaintiffs until all of the foregoing questions had been asked and answered. Then counsel for plaintiffs said:

"We object to the proposed offer because there is no question that he died by his own hand. The issue in the case is whether his death was intention or unintentional."

After some discussion not material here, the court ruled:

"Well, I will tell you, I am going to follow my judgment on this. I think that if the plaintiff had volunteered that there wasn't any doubt in his mind the boy committed suicide that would be perfectly admissible but here we have got an entirely negative approach; somebody puts this subject of suicide out there in the form of a question; he doesn't make any audible answer to it at all. I think there is too much ground for conjecture there on the part of the jury as to the implications they can draw from that. If this goes into the record it surely would be argued to the jury that he admitted that it was suicide and I don't believe that is a fair inference to draw from this sort of thing. Now, if he had said, 'No, there isn't any doubt in my mind but what the boy committed suicide, everything tends to show that', then I think you would have a different situation but here he doesn't say anything. He shakes his head; maybe it was a negative shake, but he was under stress and strain here. The record shows that there was some mourning; there was some crying going on there at the table where the husband and wife sat. I just don't believe that is enough that I dare let that go to the jury.

"My ruling is going to be that it is not going to be admitted."

It will be noted that no objections were made until all of the questions put to Doctor Dankle had been asked and answered. There is no doubt that the matter inquired into was

a proper one, and the doctor should have been permitted to answer all of the questions with the possible exception of the final one, which dealt with his interpretation of the negative sign, the headshake. That plaintiff Ernest Bill had no doubt his son had committed suicide was an admission against interest; and the error of the court in excluding it was further compounded by the fact that both plaintiffs were permitted to testify, over objection, that they knew of no reason why their son should have intentionally taken his life. The excluded testimony would not only have shown an admission against interest, but would have tended to counter and contradict the testimony last above referred to.

■ Neither the plaintiffs' motion to strike nor their objection made after all the offered questions had been answered raised any real or substantial question as to the validity of the testimony. Neither raised the point decided by the court, which seems to have been that the lateral motion of the head made by Ernest Bill was too uncertain in its meaning and so was so speculative the jury should not have been permitted to pass upon it. With this we do not agree. A nod of the head is universally understood to be an affirmative or "yes" answer; a shake of the head is equally well understood to mean a negative or "no" reply. It is true the lateral motion might in some circumstances mean merely bewilderment or confusion, an "I don't know" answer. But this was an interpretation to be made by the jury.

■■ However, although the point was not considered by the trial court and is not raised or argued by the plaintiffs here, it is suggested in this court that the offer of proof was an offer in bulk; and so, there being one question and answer —the last one—which was not competent, the entire offer was properly refused. It is true that although no proper objection is made, and even though the trial court gives a wrong reason for excluding evidence, if there is a valid basis for denying it admission, its exclusion is not reversible error. It is also correct that when an offer of proof is in bulk and some parts are improper, all may be excluded. Vandell v. Roewe, 232 Iowa 896, 898, 6 N.W.2d 295, 296, 297; Bates v. Brooks, 222 Iowa 1128, 1142, 270 N.W. 867, 874, 109 A. L. R. 1371.

■ But in the instant case the offer was by question and answer. Each question was tendered separately, and no objection was made until all had been offered. We know of no way in which the tendered evidence could have been further separated. The plaintiffs had their opportunity to object to each question as it was asked and before it was answered; and the court had the same opportunity to make its ruling on each question and answer, instead of excluding all of them as it did. It may be true that in Vandell v. Roewe, supra, the testimony was offered also by question and answer, and we said it was an offer in bulk; but we do not now agree with this holding. The evidence here was offered by separate questions and answers, readily subject to separate objections and separate rulings by the court.

The evidence was on an important point, and we cannot say it was not sufficiently prejudicial to require reversal. An admission by one of the plaintiffs, in the presence of the other, who made no objection or comment, that he had no doubt his son committed suicide, if so interpreted by the jury, would certainly have been an important matter for its consideration. Error appears at this point.

III. Further error is assigned by the defendant upon the giving of Instruction No. 3. The material part of the instruction is this: "In this connection you are instructed that in order to overcome the legal presumption against suicide the defendant must show, by a preponderance of the evidence, the existence of such circumstances and conditions concerning the death of the insured that every other cause of death than suicide has been excluded by the testimony and that no other reasonable hypothesis or theory as to the cause of death exists, among reasonable minds, except suicide; or, in other words, the testimony or proof produced by the defendant in order to overcome the legal presumption against suicide must be such that among reasonable minds every reasonable hypothesis or theory of death inconsistent with suicide has been excluded by the preponderance of defendant's testimony."

That the court was here following a rule of law laid down in several cases of this nature, involving defenses of suicide in

actions on life insurance policies, cannot be doubted. Stephenson v. Bankers Life Association, 108 Iowa 637, 641, 79 N.W. 459, 460; Wood v. Sovereign Camp of W. O. W., 166 Iowa 391, 399, 147 N.W. 888, 891; Michalek v. Modern Brotherhood of America, supra, loc. cit. 179 Iowa 40, 161 N.W. 128; Green v. New York Life Ins. Co., 192 Iowa 32, 39, 182 N.W. 808, 811; Wilkinson v. National Life Association, 208 Iowa 246, 248, 225 N.W. 242, 243. The frustration of a trial Judge who meticulously follows the law as laid down in the books, and then meets with reversal because the appellate court has changed its mind, is understandable. The rule of stare decisis, usually a dependable support for the trial court, on occasion proves to be a snare and a delusion. But this is an occupational hazard for trial Judges. Such is the situation here.

It will be noted that the evidence of suicide produced by the defendant, under this instruction and the last-cited cases, must be such as to exclude every reasonable hypothesis or theory of death inconsistent with suicide. Evidence tending to show suicide is in almost all cases circumstantial; and our general rule has been for many years that one who seeks to establish his case by such evidence is not required to exclude all other reasonable theories or hypotheses; only to prove his theory by evidence which makes it reasonably probable, and more probable than any other hypothesis based on such evidence. Almost innumerable cases might be cited on this point; but see Brower v. Quick, 249 Iowa 569, 575, 88 N.W.2d 120, 123; Bokhoven v. Hull, 247 Iowa 604, 607, 75 N.W.2d 225, 227; Soreide v. Vilas & Co., 247 Iowa 1139, 1150, 78 N.W.2d 41, 47; Hackman v. Beckwith, 245 Iowa 791, 795, 64 N.W.2d 275, 278; Allison v. Bankers Life Co., 230 Iowa 995, 1001, 299 N.W. 889, 893; and Latham v. Des Moines Electric Co., 229 Iowa 1199, 1207, 296 N.W. 372, 375.

The rule laid down by the court's Instruction No. 3 seems to have come into our law first as a general rule of circumstantial evidence in Asbach v. The Chicago, Burlington & Quincy Railway Co., 74 Iowa 248, 250, 37 N.W. 182, 184. It has long been abrogated in all civil cases involving circumstantial evidence, except in those involving the defense of suicide in actions on

life insurance policies. Why it has remained here is not clear, except that the question has apparently not been raised or considered. We see no reason why the insurer defending against a claim on a policy of life insurance on the ground that death resulted from suicide should be held to a rule so much stricter than any other litigant who relies on circumstantial evidence. In all other cases the circumstantial evidence need show only a hypothesis which is reasonably probable, not merely possible, and which is more probable than any other hypothesis based on such evidence; but the insurer in this class of cases must *entirely exclude* every other reasonable hypothesis.

The injustice of such a situation is apparent. The burden thrown on the defendant-insurer is much heavier than any other litigant is compelled to bear in establishing a theory by circumstantial evidence. We now overrule the holding of the Asbach case, supra; and the cited cases holding that an insurer defending on the ground of suicide must prove its theory by circumstantial evidence which excludes every other reasonably probable theory rather than by evidence which makes its theory not only reasonably probable, but more probable than any other theory based on such evidence.

■ IV. The offered certificate of the medical examiner should have been admitted in evidence, under Code section 339.9. It is true we held in Holloway v. Bankers Life Co., supra, loc. cit. 248 Iowa 528, 81 N.W.2d 460, that a coroner's report was not admissible. But this was before the enactment of the County Medical Examiners law by the Fifty-eighth General Assembly. This Act went into effect on January 1, 1961, and is now found in chapter 339 of the Code. Section 339.9, supra, expressly provides that reports of investigations by the county medical examiner, and records and reports of autopsies made under his authority, shall be received in evidence. The trial court was of the opinion that any error arising from the denial of admission in evidence of the report offered here was not prejudicial, because the medical examiner testified that death was caused by asphyxiation, due to the constricting rope around the deceased's neck; and "It is my opinion that the injury involved was self-inflicted." We do not have the offered medical

report in evidence, and so cannot say whether it was in substantially the same terms as the admitted testimony, as the trial court thought. But in view of a possible retrial of the case, we deem it proper to say that a "self-inflicted injury" is not necessarily the same as an "intentionally self-inflicted injury."

V. We have reviewed the other errors assigned, and do not find them meritorious. For the reasons set out in Divisions II and III the judgment is reversed and the cause remanded for further proceedings.—Reversed and remanded.

GARFIELD, C. J., and THORNTON, MOORE and STUART, JJ., concur.

SNELL, J., concurs except to Division I to which he dissents.

LARSON, HAYS and PETERSON, JJ., dissent.

SNELL, J. (concurring in part and dissenting in part)—I concur in the reversal of this case and in all of the majority opinion, except the conclusion reached in Division I that the question of suicide was properly submitted to the jury.

I think this is the exceptional case where the presumption against suicide has been overcome as a matter of law. The evidence admits of no other logical conclusion.

If, however, as the majority holds, the question is to be submitted the instructions should include one on presumption of intent.

Plaintiffs concede that decedent ended his life by his own hand. His intent is the question. Intent is a state of mind and is rarely susceptible of direct proof but a person is presumed to intend the natural consequences of an act intentionally done. Death is a natural consequence of sliding off into space with one end of a rope or length of binder twine around the neck and the other end tied to an overhead beam. The presumption against suicide is too weak to stand against the facts in this case. There is no accident when a natural and almost inevitable result follows an intentional act.

LARSON, J. (dissenting)—Although it seems a futile gesture, I feel compelled to dissent, especially in light of the fact

that, in order to reverse, the majority admittedly overrule two well established rules of long standing in this court. The situation certainly is not one which, in the interest of justice, makes a change necessary or desirable. Those rules do not cause a wrongful result here, and plaintiffs should not be denied a deserved judgment in their favor. The majority hold, and I agree, that there was ample evidence to require submission of this case to the jury. Its verdict is overwhelmingly supported by the evidence.

The majority, however, extend themselves to find reversible error in both Divisions II and III of the opinion. I can agree with neither under this record.

I. In Division II the majority point out that defendant's counsel, *anticipating* an unfavorable ruling upon an objection to testimony concerning an alleged conversation between Doctor Dankle and Mr. Bill, said: "Your Honor, we would like to make an offer of proof in chambers." No ruling on that objection appears, but we gather that the court, counsel and witness retired to chambers where further interrogation took place. Until an offer of that alleged conversation is made, the court can be charged with no erroneous ruling. What was defendant's offer here? It was pointed out in Hidy v. Murray, 101 Iowa, 65, 69, 69 N.W. 1138, 1140, that much depends upon the offer made. There *the offer* included various papers which were improper, and the court made this pertinent pronouncement: "Had the offer been made alone as to the judgment, we should have thought it error to exclude it." So we must look to see what kind of offer was made here, if any. The record fails to show any offer was really made, although the majority assume there was one.

Only in Subdivision (C) of appellant's Division IV does it complain of the court's refusal to permit testimony heard in chambers, and there it fails to set forth the record as to the alleged offer, merely referring to the pages of the record where the alleged error might be found. From the record we find that in the jury's presence the following questions were propounded to Doctor Dankle by appellant: "Q. Now, Doctor, will you state whether you had a conversation with Mr. Bill before

leaving the Niedert farm that evening? A. Yes. I talked to him, yes. Q. And what was said?" Plaintiffs objected to that testimony as hearsay and not binding on Norma Bill. When her presence had been established, the question was asked: "Q. What was said at that time? A. I asked him if there was any doubt in his mind that his son committed suicide." Objection was made and, as stated by the majority, the appellant, not waiting upon a ruling, stated he would like to make *an offer* of proof outside the presence of the jury.

Thereafter, outside the presence of the jury, counsel for defendant asked Doctor Dankle: "Q. Doctor, did you have a conversation with Ernest Bill in the presence of Norma Bill at the Niedert farmhouse just before you left on the night of January 12? A. Yes. Q. What did that conversation consist of on your part and on his? A. I said to Mr. Bill, 'Is there any doubt in your mind that your son committed suicide?' and if I might describe the situation, he and his wife were sitting at the table mourning and tearful, and he just shook his head. Q. In what direction, Doctor, if you will say it so that the record can pick it up. A. A lateral motion of the head. Q. That is commonly interpreted as a negative sign? A. Which I interpreted as a negative sign." Counsel then said: "Thank you, Doctor. That is all." Following an objection and an informal discussion off the record, further questions were propounded. "Q. Doctor, had there been any discussion of this in the presence of the Bills before you asked them the question? A. Well, I don't know about that. Q. Not between you and the Bills but between you and Powers and Niedert in the presence of the Bills. A. No." Obviously the question as to the probative value of this so-called conversation was discussed.

Whatever happened, it is clear that no specific offer of this so-called conversation was ever made. It appears that, following an informal discussion not reported, the court expressed an opinion that such evidence was not admissible, that the description of the father's head motion as interpreted by the witness would not itself establish an inference that Mr. Bill admitted his son committed suicide. In that view I believe the court was correct. Considering the shock and strain these

parents were then under, and the fact that Mr. Bill did not go closer to the boy's body than the ladder to the loft, and the mother did not enter the barn, the head motion could reasonably be intended as a gesture of bewilderment, an indication of "I don't know." Certainly the probative value of this evidence as an admission against interest would be almost nil and, even if it had been properly offered and refused, would not have amounted to reversible error.

Obviously, as the majority concede, if the offer had been properly made and if there had been a valid basis for its rejection, the court's action in rejecting it for a wrong reason would not be reversible error. They also concede that if a bulk offer is made, and some parts thereof are improper, all may be excluded. Since, in addressing the court, appellant itself used the singular, i.e. "would like to make an offer", its offer, if it was an offer at all, was a bulk offer. Since it is admitted that Doctor Dankle's interpretation of Mr. Bill's head movement as a negative reply was inadmissible, it is inescapable that under our well established rule this bulk offer was inadmissible. The majority do not deny this is the rule announced in Vandell v. Roewe, 232 Iowa 896, 898, 6 N.W.2d 295, 296, 297, which they cite, and in every other case heretofore decided on that question. Hidy v. Murray, supra, 101 Iowa 65, 69, 69 N.W. 1138; Flam v. Lee, 116 Iowa 289, 297, 90 N.W. 70, 93 Am. St. Rep. 242; Mosnat v. Chicago & N. W. Ry. Co., 114 Iowa 151, 152, 86 N.W. 297; Allen v. Travelers Protective Assn., 163 Iowa 217, 226, 143 N.W. 574, 48 L. R. A., N. S., 600. Also see Bates v. Brooks, 222 Iowa 1128, 1141, 270 N.W. 867, 109 A. L. R. 1371.

They do somehow find in appellant's request "to make an offer" a request to make a separate offer of each and every question and answer of the so-called conversation between Dankle and Bill. How they can say appellant offered each question separately and charge plaintiffs with failure to object until a specific offer was tendered, I cannot understand. Nothing in the record supports such a claim as to the offers. Such a rule, if accepted, would relieve every offeror of his just responsibility to make a good clear specific offer upon which the court could rule, and place the obligation upon opposing counsel to object

to every parcel thereof under penalty of having waived objection. It would make the court's task impossible, for until all of the proposal is before the court it would be difficult to tell whether it would be competent, relevant and material to any issue before the court.

In the Vandell v. Roewe case we considered the identical question and held that, although there were eight questions and answers in the offer, it was a bulk offer, and that the inclusion of inadmissible questions made rejection of the offer necessary. The majority "do not now agree with this holding", and so, with little or no consideration of the existing rule, good or bad, hold that where the evidence was produced by separate questions and answers, readily subject to separate objections and separate rulings by the court, such questions and answers are separate offers and require separate rulings by the court regardless of form of the offer. I cannot agree that this rule change is necessary or even desirable. The burden of making a proper and specific offer should not be shifted to opposing counsel and the court under no less penalty than a waiver for the lack of timely objections. The better rule is to require the offeror to make clear his proposal, either as separate offers or as one offer of evidence in bulk if that is his desire. Here, if we consider appellant made any offer, the offer of the *purported* conversation was in bulk and, since it included inadmissible testimony, its rejection would have been perfectly proper.

I further do not agree with the majority that this "evidence was on an important point, and * * * sufficiently prejudicial to require reversal." The probative value of this testimony was insignificant. When its relevancy is doubtful, we usually permit the trial court's judgment to prevail on such matters. I seriously doubt that the jury would have seriously considered this alleged answer to such an untimely question by Dankle, to say nothing of considering it an admission that the father believed his son had committed suicide. He had never been closer than the loft ladder to his son's body, and Mrs. Bill had never been in the barn. I would hold no prejudice occurred in refusing that testimony and in accepting the testimony of the Bills that they knew of no reason why their son would wish to

commit suicide. The latter statement has generally been held permissible. See Kirschbaum v. Metropolitan Life Ins. Co., 133 N. J. L. 5, 42 A.2d 257, 258, 158 A. L. R. 743 (1945). I would hold this alleged error does not justify granting a new trial here.

II. In Division III the majority overrule a well established and carefully considered rule which has existed in this court for over a half century. With a weak apology to the learned trial court, and no apology to able counsel and the litigants, the rule is changed. Of course this court has that right, but I submit it should not be done hastily and without careful consideration.

No adequate consideration seems to have been given to changing this rule requiring that the testimony or proof produced by the defendant, in order to overcome the legal presumption against suicide, must be such that among reasonable minds every reasonable hypothesis or theory of death inconsistent with suicide has been excluded by the preponderance of defendant's testimony. The thought that this rule has not been fully considered in the past has no support at all. It was so considered by some of our ablest Judges. In the case of Michalek v. Modern Brotherhood of America, 179 Iowa 33, 39–45, 161 N.W. 125, Judge Weaver discussed the application of this rule saying these rules and principles must govern in such a case:

"That the defense relied upon is an affirmative one, and the burden of establishing it is upon the appellee, is so well settled that we will not take the time necessary for the citation of authorities. The burden thus assumed is something more than ordinarily rests upon a party who undertakes to establish an asserted fact over the bare denial of his adversary. In a case of the latter class, there is ordinarily no presumption for or against either party. Here, however, the defendant is met by a presumption against suicide or suicidal intent. That such is the general rule, all courts admit, but as to its effect and operation, there is some dissonance of opinion. Some have treated the presumption as of rather slight value and easily overcome (Agen v. Metropolitan Life Ins. Co., 105 Wis. 217); but by far the greater number and the better reasoned cases unite in holding that the party charging suicide, where circum-

stantial evidence is relied upon to support the claim, can overcome the presumption against self-slaughter only by proof of facts which exclude every reasonable hypothesis of natural or accidental death. Such has repeatedly been our own holding. We have said, for example:

" 'This presumption has the effect of affirmative evidence, and, unless so negatived . . . as to leave room for no other reasonable hypothesis than that of suicide, such presumption will be allowed to prevail, and a verdict thereon will not be set aside for want of evidence.' Stephenson v. Bankers Life Assn., 108 Iowa 637, 641.

"It has been elsewhere said:

" 'If the known facts are consistent with a cause of death which does not involve self-destruction, that cause must be accepted. After all the hypotheses which are consistent with an innocent or accidental death are eliminated, the conclusion of suicide may then be drawn. The burden is upon the defendant to show that the circumstances and conditions are inconsistent with any other reasonable cause of death than that of suicide; that is, it must eliminate and disprove all other causes of death which are consistent with the evidence before the jury is justified in inferring that the deceased committed suicide.' Lindahl v. Supreme Court I. O. F., 100 Minn. 87 (110 N.W. 358).

"See also Metropolitan Life Ins. Co. v. DeVault, 109 Va. 392, 402. * * * Says the Virginia court:

" 'We are of opinion that the defense of suicide should be established by clear and satisfactory proof, such as is required to establish a fraud.' Life Ins. Co. v. Hairston, 108 Va. 832. Walden v. Bankers Life Assn., 89 Neb. 546.

"Even where, as in this case, there is direct evidence that the death was caused by a weapon in the hands of the deceased himself, the presumption still prevails; because, if nothing more than that is shown, there is still room for the hypothesis that his act in that regard may have been involuntary or accidental. Paulsen v. Modern Woodmen of Am., 21 N. D. 235 (130 N.W. 231); Industrial v. Watt, 95 Ark. 456; Walden v. Bankers Life Assn., 89 Neb. 546 (131 N.W. 962). This presumption has been held to prevail where it was certain that the pistol could not

have been fired except by pulling the trigger, because it may have been pulled unintentionally or involuntarily. Mutual Life Ins. Co. v. Ford (Tex.), 130 S.W. 769 (131 S.W. 406). * * * This is not saying that the facts mentioned have no tendency to prove suicide; for they do. * * * It would also have been proper for the jury—indeed, it would have been its duty—to throw into the scale in plaintiff's favor the fact of universal knowledge and observation that sane men do not generally seek death, but rather are at all times solicitous to avoid it. In this connection is to be remembered another fact: that suicide by a sane man is an act of moral turpitude, if not a crime; and, if the facts surrounding death can be reconciled with any reasonable theory of an innocent or accidental cause, it is the duty of courts and jurors to adopt that explanation. Walcott v. Metropolitan Life Ins. Co., 64 Vt. 221."

Judge Weaver concludes: "The attitude of this court with reference to the strength of the presumption against suicide is shown in the Stephenson case, from which we hereinbefore quoted. There the insured had been confined in an asylum for the insane. He was permitted to go home, accompanied by a friend. He then obtained a revolver with the avowed intention of shooting the sheriff, should that officer attempt to take him back to the asylum. Coming home with the weapon, instead of going into the house, he passed into the barn, and very quickly a shot was heard. His friends, going to the barn, found him flat on his back, his hand extended, grasping the revolver; and near the center of the forehead, a fatal bullet wound. There, as here, the company asserted it was a plain case of suicide; but we held that the question was one for the jury. * * *

"It must be remembered that, in order for plaintiff to recover under the issues and the admitted facts, she was not required to set up or prove the truth of any particular theory of the exact manner of Michalek's death. To defeat her recovery, the defense was required to prove its theory of suicide, and this it cannot be said to have done, no matter how strong or persuasive the showing, unless it goes to the extent of eliminating every theory of death otherwise than by suicide."

In Wilkinson v. National Life Assn., 208 Iowa 246, 247, 248,

251, 225 N.W. 242, we quoted with approval from Michalek v. Modern Brotherhood of America, supra, and also from the first Wilkinson case, 203 Iowa 960, as follows:

" 'It was not for the trial court, nor is it for this court, to determine facts or draw inferences, where reasonable minds might come to different conclusions. The defendant had the burden of proof. No witness saw the deceased at or near the time or place of the tragedy. The evidence is entirely circumstantial. The presumption is against suicide. To overcome this presumption by circumstantial evidence, the defendant must show the existence of such circumstances and conditions as to leave room for no other reasonable hypothesis than that of suicide. In other words, the evidence must be such that all reasonable minds must say that the presumption has been overcome, suicide has been proved, and any hypothesis or theory inconsistent with suicide excluded'." Judge Wagner also had this to say as to the rule we have heretofore followed:

"It is not for us to determine how the deceased met his death. The presumption is that the death was accidental. The burden of proof is upon the defendant to prove its theory of suicide, and it cannot be said to have done this, no matter how strong or persuasive the showing, unless it goes to the extent of eliminating every theory of death otherwise than by suicide. * * * Under the record, the death of the decedent was either accidental or suicidal. The burden was upon the defendant to prove the latter and overcome the presumption of the former. *This cannot be done by showing a probability only of suicide.* The circumstantial evidence is not sufficient to exclude every reasonable hypothesis other than that decedent's death was suicidal." (Emphasis supplied.)

In Green v. New York Life Ins. Co., 192 Iowa 32, 39, 40, 182 N.W. 808, 811, we again consider the rule and its reasons, reaffirmed the cases above cited, and quoted this from Stephenson v. Bankers Life Assn., 108 Iowa 637, 641, 79 N.W. 459, 460:

" 'There is a presumption in favor of the theory of accident. This presumption has the effect of affirmative evidence, and, unless so negatived by the surrounding facts and circumstances

as to leave room for no other reasonable hypothesis than that of suicide, such presumption will be allowed to prevail, and a verdict founded thereon will not be set aside for want of evidence.' " In this regard Judge Faville said:

"However, it is clear that the burden rests upon the defendant to establish that the death was the result of suicide, rather than accident, and that the evidence to overcome the presumption of death by accident must be such 'as to leave no other reasonable hypothesis than that of suicide.' * * * Applying these rules to the instant case, we are met with this proposition: Do the facts disclosed by the evidence so negative the presumption that death was accidental as to leave no other reasonable hypothesis than that of suicide? If it could fairly be said that, under all the evidence, the minds of reasonable men might differ as to whether the insured came to his death by accident or by suicide, then it was a question for the jury."

Clearly, the majority here overlook the exceptional nature of these insurance cases where the company in its policy has willingly accepted the burden of proof to establish the fact of suicide if it denies liability. They see no reason for a different rule in such cases than in the usual case where only circumstantial evidence is submitted. In support of what they call the general rule of long standing they cite several cases, none of which involves insurance or suicide. Then they say: "Evidence tending to show suicide is in almost all cases circumstantial; and our general rule has been for many years that one who seeks to establish his case by such evidence is not required to exclude all other reasonable theories or hypotheses; only to prove his theory by evidence which makes it reasonably probable, and more probable than any other hypothesis based on such evidence." They do not recognize any need for a different rule in the insurance suicide case, and do not attempt to meet the reasons heretofore advanced for such a rule. I am not convinced.

It is sufficient to say that the cases I have cited all recognize the extra burden which is assumed by the insurance company's contract, a contract which provides it will pay full death benefits except and unless "the insured * * * shall, within two years from the date of issue of this policy, die by suicide * * *."

Insurance companies certainly have recognized the burden assumed by them and have considered this well established legal presumption against one willfully taking his own life, when inserting such a provision in their contracts. It may be assumed their contracts were prepared with that in mind. Why should it be changed now?

The rule we have set out as applicable to cases of this nature is a good one and I feel the majority's reasons for overruling it have no merit. Admittedly, this is not the case involving double indemnity claims, such as Allison v. Bankers Life Co., 230 Iowa 995, 999, 299 N.W. 889, where the rule advocated by the majority was applied. There is a mark of distinction between them. The burden of proof in that case was upon the beneficiaries to prove death was an accident, and the same strong presumption does not aid them here. It is quite different where the burden is placed upon the beneficiaries of the insurance to prove an accidental death, and where the beneficiary aided by the presumption against suicide actually defends, with the insurer assuming the burden to prove death occurred only from that cause.

Suicide, as used in the policy of insurance involved, means an "Act or an instance of taking one's own life voluntarily and intentionally." Webster's New International Dictionary, 2d Ed. The defense relied upon herein is an affirmative one, both due to the fact that defendant pleaded nonliability because of suicide and because of the common-law presumption that death is natural or accidental. Much has been written on the nature of this presumption and the effect of rebuttal upon it. Marquette Law Review, Volume 19-20, pages 20–38; Yale Law Journal, Volume 56, pages 482–508. However, as pointed out in In re Estate of Lundvall, 242 Iowa 430, 437, 46 N.W.2d 535, 539 (1951), and in 37 Iowa Law Review 300 (1952), these propositions are no longer open to doubt in Iowa. We have rejected the Thayer-Wigmore Theory and adhere to what is known as rule 14(a) of the Uniform Rules of Evidence (1953). Rule 13 of said rules provides: "A presumption is an assumption of fact resulting from a rule of law which requires such fact to be assumed from another fact or group of facts found or otherwise established in the action."

The Iowa court, at least in some of its decisions, has taken a position similar to the uniform rules of the Conference of the Commissioners on Uniform State Laws.

The presumption against suicide, as we have often pointed out, is a strong one. Brown v. Metropolitan Life Ins. Co., 233 Iowa 5, 10, 7 N.W.2d 21. The "logical core" upon which it is based is that sane men do not ordinarily seek death, but on the contrary at all times try to avoid it. In Reddick v. Grand Union Tea Co., 230 Iowa 108, 118, 296 N.W. 800, 804, we recognized the logical basis of this presumption, saying "Love of life is strong. Suicide by a rational man is an act of moral turpitude. If the facts surrounding death can be reconciled with any reasonable theory of innocence or accidental cause, that explanation will be adopted."

It is sufficient to point out in the case at bar there are no circumstances or evidence tending to prove LeRoy had any reason or desire to take his own life. Outside of the physical facts disclosed when he was discovered, there is nothing in the record to rebut the basic assumption that he desired to live and did not lack moral integrity.

It is clear to me that the rule we have previously followed in such cases is soundly based, even if it is considered an exception to what the majority wish to call the general rule as to defendant's burden, and there is no adequate showing here why that long established rule should be abandoned. I have attempted to explain why it should not be discarded. I would, of course, affirm the trial court and its judgment herein.